(No. 67879.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JIMMY RAY PITSONBARGER, Appellant.

*Opinion filed November 30, 1990.—Modified on denial of rehearing April 1, 1991.*

364

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M.

Madsen and Thomas L. Ciecko, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Jimmy Ray Pitsonbarger, was convicted following a bench trial in the circuit court of Peoria County of two counts of knowingly causing the deaths of Claude and Alta Brown and of four counts of felony murder based on the felonies of burglary and home invasion with respect to each victim. The State moved for a death penalty hearing, which was held before a jury. The jury concluded that the defendant was eligible for the death penalty, finding that he was 18 years of age or older at the time of the offense (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and that aggravating factors set out in section 9—1(b)(3) (the defendant killed two or more persons) and 9—1(b)(6) (the murders were committed in the course of a felony) were present. The jury considered the mitigating and aggravating evidence and concluded that no mitigating factors sufficient to preclude the imposition of the death penalty existed. The circuit court sentenced the defendant to death. The sentence was stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The defendant raises numerous issues on appeal regarding the trial and the sentencing hearing. These issues include: (1) whether the defendant was properly found guilty of felony murder based on the offense of burglary; (2) whether four of the six counts of murder must be vacated because there were only two homicides; (3) whether prospective jurors were improperly excused for cause; (4) whether the death penalty was excessive in light of the significant mitigating factors presented by the defendant at the sentencing hearing; (5) whether the defendant was denied a fair sentencing hearing because

irrelevant and prejudicial evidence was admitted to evoke sympathy for the victims; (6) whether the defendant should have been returned to Nevada pursuant to an interstate agreement on detainers; (7) whether the prosecutor's closing argument contained prejudicial comments; (8) whether the defendant's tendered instructions concerning the applicability of "mercy" and "compassion" were properly refused; (9) whether the defendant's tendered instruction on statutory and nonstatutory mitigating factors was properly refused; (10) whether the introduction of evidence of unadjudicated criminal conduct during the second stage of the death penalty sentencing hearing denied the defendant a fair sentencing hearing; (11) whether the Illinois death penalty statute violates due process by not requiring the State to prove beyond reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death penalty; (12) whether the Illinois death penalty statute is unconstitutional because it places the burden on the defendant to prove that death should not be imposed; (13) whether the jury was properly instructed on the burden of proof; and (14) whether our death penalty statute is unconstitutional as arbitrary.

In the guilt phase of the trial, the State introduced testimony of several neighbors of the victims, the victims' daughter and various police officers and technicians. A statement by the defendant was also introduced in which the defendant admitted entering both the Brown residence and a neighboring residence, the residence of Mary McDowell. In the statement, he admitted taking money from both homes, taking weapons from the McDowell home, killing Claude and Alta Brown and taking Claude Brown's truck.

Mary McDowell, a neighbor of Claude and Alta Brown, testified that upon returning to her home on August 27, 1987, she found that her home had been broken

into and that money, a double-barrel 16-gauge shotgun, a .22-caliber rifle and a .22-caliber revolver and ammunition were missing. McDowell testified that after attempting to contact Claude Brown, she contacted a neighbor, Leon Woolsey, who testified at trial that he entered the victims' home and found the bodies of Claude and Alta Brown. Coroner Philip Immesoet testified that Claude and Alta Brown died from multiple gunshot wounds. Crime laboratory technicians testified that fingerprints matching the defendant's were found at the McDowell residence, that a shoe print matching the defendant's shoe was found at the Brown residence and that the blood type of stained materials taken from the Brown home was comparable in type to the defendant's blood type (and not comparable to that of Claude or Alta Brown).

The .22-caliber revolver taken from the McDowell home was recovered in Reno, Nevada, in a hotel room occupied by the defendant. Expert testimony revealed that bullets recovered from the bodies and from the Brown home matched those fired from the .22-caliber revolver recovered from the defendant's hotel room. Claude Brown's truck, in which several personal items belonging to the defendant were found, was recovered in Columbia, Missouri. Reviewing the defendant's statement and the State's evidence, the trial judge found the defendant "guilty of the offense of first degree murder in the manner and form as set forth in each of the six counts of the indictment."

The death penalty hearing was conducted before a jury. During the eligibility for the death penalty stage, various witnesses, including neighbors and police officers and technicians, gave again their trial testimony and the videotape of the defendant's confession was shown to the jury. The jury concluded that the defendant was eligible for the death penalty, finding that he was over 18

years of age at the time the offense was committed (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and that five statutory aggravating factors existed, one statutory aggravating factor based on multiple murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), two statutory aggravating factors based on the finding that each of the murders occurred during a burglary (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c)) and two statutory aggravating factors based on the finding that each of the murders occurred during the course of a home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c)).

The State, at the second stage of the sentencing hearing, as evidence in aggravation, introduced the testimony of 15 witnesses. The first witness, a Peoria police officer, Stephan Eakle, testified to an incident in which he found the defendant near a pool where several teenage girls were skinny dipping. Eakle testified that when he asked the defendant for identification, the defendant swung at him and fled. Rhonda Mahnesmith and Officer John Krider also testified as to an unrelated incident in which the defendant was identified as a "Peeping Tom." Six jail guards and police officers testified to various acts of confrontational conduct on the part of the defendant after he was taken into custody.

Testimony also established that after killing the Browns, Pitsonbarger drove to Columbia, Missouri. Detective Susan Wooderson, a Columbia police officer, testified that she interviewed the defendant after he was arrested in Nevada and that in her interview with the defendant he admitted killing a man in Columbia, Missouri. After leaving Missouri, the defendant drove to Nevada. John Isaac, a Verdi, Nevada, gas station attendant, testified that the defendant robbed him at gunpoint on August 31, 1987. After leaving the gas station, the defendant drove to Reno, Nevada, secured a hotel room and called a prostitute, Mary Lou Quayle. Quayle testi-

fied that on the evening of August 31, 1987, the defendant forced vaginal and oral sex upon her at gunpoint, attempted to strangle her with a towel and finally shot her in the head. Shortly after this incident, the defendant surrendered to Nevada police. In connection with the gas station robbery and the incident with the prostitute in Nevada, the defendant was charged with and convicted of sexual assault, attempted murder, armed robbery and several lesser offenses, for which he was given four life sentences without parole and additional terms of years on the lesser charges.

In mitigation, the defense offered the testimony of six witnesses. Theordore Matthews, a clinical psychologist, testified that the defendant had a turbulent childhood, that he had a drug and alcohol problem and that he was suffering from a mental disorder characterized by suicidal tendencies, impulsiveness and a chronic feeling of emptiness and emotional instability. Matthews testified that the defendant's emotional disorder, combined with his heavy drinking on the day of the offense, caused him to suffer from a toxic psychosis, a psychotic condition directly following toxicity produced by alcohol ingestion. Matthews stated that he believed that the defendant was under extreme mental or emotional disturbance at the time of the crimes and that he had no direct control over his behavior.

Psychiatrist Mortimer Beck also testified that the defendant was suffering from a long-standing personality disorder and that he was under the influence of an extreme mental or emotional disturbance at the time of the offense. Beck stated that the defendant's mental disease was the result of his turbulent childhood and heredity, not purely the defendant's voluntary behavior.

Probation officer John Simpson testified to the findings contained in his presentence investigation report. He testified that the defendant had a turbulent child-

hood, that his father was an alcoholic who had beaten him and sexually abused his sisters, that the defendant had a long-standing alcohol problem and that at the age of 21 he was diagnosed, by the Tazwood Human Service Center, as an alcoholic.

The defendant's ex-wife, Linda Esslinger and his sister, Diana Worrick, both testified that the defendant had a serious drinking problem and that he became violent when he was drunk. Worrick further testified that on the day of the murder of Claude and Alta Brown, the defendant began drinking at 10:30 in the morning and that he consumed several beers at her home later that afternoon. Finally, Judith Oller, testified that the defendant was at the King's Den Lounge when she arrived there at 6 o'clock in the evening and that he drank Bloody Marys and beer until 11 o'clock that evening.

The jury found that the mitigating factors presented by the defendant were not sufficient to preclude imposition of the death penalty and the court sentenced him to death. The defendant's motion to vacate the death sentence was denied.

The first two contentions raised by the defendant concern both conviction and sentencing issues. The remainder of the contentions deal with sentencing issues alone. We will first consider each conviction issue.

The defendant first contends that the evidence presented at trial did not establish that he committed the offense of burglary and that the felony-murder convictions based on burglary must be reversed and the cause remanded for a new sentencing hearing.

A person commits burglary when:

> "without authority he knowingly enters or without authority remains within a building, housetrailer, watercraft, aircraft, motor vehicle as defined in the Illinois Vehicle Code, railroad car, or any part thereof, with intent to commit therein a felony or theft. This offense shall not

include the offenses set out in Section 4—102 of The Illinois Vehicle Code, nor the offense of residential burglary as defined in Section 19—3 hereof." Ill. Rev. Stat. 1985, ch. 38, par. 19—1.

The evidence at trial, the defendant argues, demonstrated that he unlawfully entered the Brown residence, but, he says, such evidence cannot support a conviction for burglary under section 19—1. The offense of burglary covers the unauthorized entry into buildings and other structures but does not include the unauthorized entry into the dwelling place of another. (*People v. Sturlic* (1985), 130 Ill. App. 3d 120, 127; see also *People v. Bales* (1985), 108 Ill. 2d 182, 193.) The burglary statute clearly provides: "This offense shall not include the offense[s] *** of residential burglary ***." (Ill. Rev. Stat. 1985, ch. 38, par. 19—1.) A person commits residential burglary when he:

> "knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." (Ill. Rev. Stat. 1985, ch. 38, par. 19—3.)

The defendant concedes that his conduct may have been sufficient to support a charge of residential burglary under section 19—3, but, he argues, residential burglary was not charged or relied on as the basis for the felony-murder counts.

The State does not dispute that the distinction between burglary and residential burglary pointed out by the defendant is accurate. It argues, however, that the distinction is irrelevant here. The entry into the residence of the victims was the subject of the indictment for felony murder based on home invasion, the State says, and the theft of Claude Brown's truck was the subject of the indictment for felony murder based on burglary.

A person may properly be convicted of burglary under section 19—1 when, without authority, he knowingly

enters a motor vehicle with the intent to steal the vehicle itself. (*People v. Steppan* (1985), 105 Ill. 2d 310, 317.) Here, there was certainly sufficient evidence to support a conviction for burglary of a truck. The defendant himself admitted taking the truck after shooting Claude and Alta Brown. Further, the defendant's confession to it is supported by evidence in the record. Several witnesses testified to the absence of the truck the morning after the murder, police testimony established that the defendant's personal items were found in the Brown's truck after it was recovered in Missouri and testimony established that the defendant's car had gone into a ditch earlier that evening and was apparently inoperable. The trial judge, considering this evidence, certainly properly found the defendant guilty of burglary.

The defendant responds that even if the evidence was sufficient to convict the defendant of burglary, it was not sufficient to convict him of felony murder based on burglary because the murders were not committed "in the course of" the felony. Section 9—1(b)(6) requires that the murders occur "in the course of" another felony. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) The defendant argues that, here, there is no evidence that the intent to steal the truck was anything but an unrelated afterthought. In *People v. Flores* (1989), 128 Ill. 2d 66, 97, we held that in order to find that the defendant committed the murders in the course of a felony, it is not necessary to find that the defendant formed the criminal intent to commit the other felony before committing the murder. In *Flores*, the defendant took the victim's jewelry after he murdered her and argued that, therefore, he could not have committed the murder "in the course of" a robbery.

We also considered this same argument in *People v. Thomas* (1990), 137 Ill. 2d 500. In *Thomas*, the defendant argued that it was not possible for him to commit

murder "in the course of" arson because the victim was already dead at the time he started the fire. We held that it was not necessary to prove, beyond a reasonable doubt, that the defendant formed the criminal intent to commit arson before committing murder and that it is sufficient that the State proved the elements of the crime and the accompanying felonies were part of the same criminal episode. (*Thomas*, 137 Ill. 2d at 534; see also *People v. Richardson* (1988), 123 Ill. 2d 322, 359; *People v. Walker* (1982), 91 Ill. 2d 502.) Here, the State proved that the defendant committed both a murder and a burglary. The trial testimony and the evidence sufficiently support the conclusion that the murders occurred "in the course of" a burglary.

The defendant's argument basically is that the State charged him with the wrong offense, *i.e.*, burglary, instead of residential burglary. The defendant supports his argument by citing to an incomplete instruction tendered by the State and given by the trial judge to the jury in the eligibility phase of the death penalty hearing. The incomplete instruction defined burglary as "an unauthorized entry into a building with intent to commit a theft." The defendant argues that he was not properly convicted of burglary because the State never specified that it was charging the defendant with burglary of a truck and because the instruction given at the sentencing hearing showed that the State intended to charge the defendant with and to introduce evidence to prove that the defendant committed residential burglary and not burglary of a truck. The defendant further concludes from this evidence that the trial judge necessarily found the defendant guilty of residential burglary. We do not agree.

The defendant's argument is purely speculative. Although the State never specified that the felony murder was based on burglary of a truck, it also never specified that it was basing the felony-murder count on burglary

of a residence. Further, the defendant fails to consider that the evidence is sufficient to support a burglary conviction and ignores the fact that testimony regarding the theft of the truck was offered during trial. Where the evidence is sufficient to convict the defendant of the crime charged in the indictment, we will not speculate that the verdict was for a crime not charged in the indictment. (See, *e.g., People v. Hall* (1986), 114 Ill. 2d 376; *People v. Guest* (1986), 115 Ill. 2d 72 (a trial judge is presumed to have considered only proper evidence and to have disregarded inadmissible evidence).) Here, the evidence was clearly sufficient to convict the defendant of the offense of burglary. The felony-murder convictions based on burglary, therefore, are supported by the evidence.

The defendant next argues that even if the felony-murder convictions based on burglary were proper, he is still entitled to a new sentencing hearing because the jury found that he committed the murders in the course of a burglary based on an incomplete burglary instruction. At the close of the evidence at the first stage of the death penalty hearing, the jury requested definitions of burglary and home invasion. The definition given to the jury defined burglary as "the unlawful entry into a building." After being given these definitions the jury found, as an aggravating factor, that the murders were committed in the course of a burglary. At the second stage of the sentencing hearing, the jury was instructed to consider all of the evidence presented at the first stage, including its finding that the murders occurred during the course of a burglary.

The fact that the jury received an incomplete instruction on the offense of burglary does not affect either the jury's determination that the defendant was eligible for the death penalty or its determination that the defendant should be sentenced to death. A defendant who has

been convicted of murder is eligible for the death penalty if he has attained the age of 18 and the jury has found the existence of at least one aggravating factor. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b).) Here, during the first phase of the sentencing hearing, the jury found the existence of five aggravating factors: that the defendant committed multiple murders (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), that each murder was committed in the course of a home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), and that each murder was committed in the course of a burglary (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). Even if it would be assumed that the jury considered the improper burglary instruction and that its determination that the murder was committed in the course of a burglary was based on the incorrect definition, the defendant was still subject to the death penalty under section 9—1(b)(3) (multiple murders) and section 9—1(b)(6) (murder committed during a home invasion). Our statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors. (*People v. Coleman* (1989), 129 Ill. 2d 321, 345; *People v. Terrell* (1989), 132 Ill. 2d 178, 225; see also *Zant v. Stephens* (1983), 462 U.S. 862, 880, 77 L. Ed. 2d 235, 252, 103 S. Ct. 2733, 2744.) The jury's reliance, if any, on the incomplete instruction, therefore, could not affect its finding that the defendant was eligible for the death penalty.

At the second stage of a death penalty hearing, the jury considers any aggravating and mitigating factors which are relevant to imposition of the death penalty. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(g), (h).) Any reliable or relevant evidence, including the circumstances surrounding the victims' death, may be considered. (See *People v. Coleman* (1989), 129 Ill. 2d 321, 345-46; *People v. Terrell* (1989), 132 Ill. 2d 178, 225.) Prior to the deliberations at the second stage of the sentencing hearing,

the court instructed the jury to consider any evidence presented during the first part of the death penalty hearing, which included the aggravating factors that the murders were committed during the course of a burglary. Since the jury received the incomplete definition of burglary at the eligibility stage and was instructed to consider that evidence at the second stage, the defendant argues that the jury considered two improper statutory aggravating factors.

Even assuming that the jury considered the burglary (as defined by the incomplete instruction) in imposing the death penalty, the error was harmless. In *Clemons v. Mississippi* (1990), 494 U.S. 738, 741, 108 L. Ed. 2d 725, 733, 110 S. Ct. 1441, 1444, the Supreme Court held that the Federal Constitution does not prevent a State reviewing court from upholding a death sentence that is based, in part, on an invalid or improperly defined aggravating circumstance either by reweighing the aggravating and mitigating evidence or on the grounds of harmless error. Here, we consider it clear that the sentence would have been the same even if the burglary instruction had been fully and properly given to the jury. The failure to tender a complete burglary instruction was harmless.

Here the evidence of the defendant's guilt was overwhelming and there is no argument that properly instructing the jury on burglary would not have changed the jury's determination to sentence the defendant to death. The jury was aware through properly introduced testimony that the defendant had admitted stealing the truck and that his intent to steal it was corroborated by physical evidence, i.e., his clothes were found in the truck and his car had gone off the road and was inoperable. Giving a complete burglary instruction certainly would not have changed the jury determination that the death penalty should be imposed. Furthermore, the im-

proper burglary instruction did not lead to the introduction or consideration of any evidence not already properly before the jury. Evidence regarding the defendant's entry into the victims' home was properly admissible to prove the home invasion.

Although it is not mandated in every case, especially where such a determination would be speculative or impossible, it is constitutionally permissible for a reviewing court to determine that given the facts of the individual case, the result would be the same had the defect in the instructions not been present. (*Clemons v. Mississippi* (1990), 494 U.S. 738, 754, 108 L. Ed. 2d 725, 742, 110 S. Ct. 1441, 1451.) This, we find, is the case here.

The defendant next argues that the felony-murder convictions based on burglary and home invasion must be vacated because he could not be convicted of more than one murder arising out of the same physical act. The defendant was charged with two counts of knowingly causing the deaths of Claude and Alta Brown (Ill. Rev. Stat. 1985, ch. 38, par. 9–1(a)(1)), with two counts of felony murder based on burglary (Ill. Rev. Stat. 1985, ch. 38, par. 9–1(a)(3)) and with two counts of felony murder based on home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 9–1(a)(3)). The trial judge following the bench trial found the defendant "guilty of the offense of first degree murder in the manner and form as set forth in each of the six counts of the indictment."

A defendant cannot be convicted of more than one murder arising out of the same physical act. (*People v. Mack* (1984), 105 Ill. 2d 103.) When multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated. In *Mack*, the defendant was charged with and convicted of intentional, knowing and felony murder. This court stated that although there was evidence to support a conviction of all three charges, there was only one man murdered and,

therefore, there could be but one conviction for murder. (*Mack*, 105 Ill. 2d at 136-37.) The court stated that when multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense. (*Mack*, 105 Ill. 2d at 137.) Because the intentional killing involved the more culpable mental state, the court upheld the intentional murder conviction and vacated the knowing murder and felony-murder convictions. *Mack*, 105 Ill. 2d at 137; see also *People v. Guest* (1986), 115 Ill. 2d 72, 103 (where the defendant was charged with and convicted of intentional, knowing and felony murder, the conviction for the most serious murder offense charged will be upheld, with convictions on the less serious murder charges vacated); *People v. Lego* (1987), 116 Ill. 2d 323, 344 (where judgment was entered on four murder counts, the court held that because it involves a more culpable mental state, intentional murder is a more serious crime than felony murder and therefore, upon affirming the defendant's conviction for intentional murder, the other convictions must be vacated).

Here the defendant was convicted on six counts of murder. Although the evidence may have been sufficient to establish guilt on all six counts, only two homicides occurred and it is, therefore, necessary that the convictions for intentional murder be affirmed and that the convictions for felony murder be vacated.

The defendant argues that he is entitled to a new sentencing hearing because the jury was instructed to consider the felony-murder convictions, which we have held should be vacated, in its sentencing determination. Although the felony-murder convictions are vacated, any consideration of the convictions by the jury at the sentencing hearing was harmless error at both the first and second stage of the sentencing hearing.

The defendant was eligible for the death penalty even if the convictions for felony murder were improper. As stated above, a defendant who has been convicted of murder is eligible for the death penalty if he has attained the age of 18 and the jury has found the existence of at least one aggravating factor. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) Here, apart from the felony murder based on burglary and the felony murder based on home invasion, the defendant was still independently eligible for the death penalty under section 9—1(b)(3) (multiple murders). (See *People v. Terrell* (1989), 132 Ill. 2d 178, 225; *People v. Coleman* (1989), 129 Ill. 2d 321, 345; see also *Zant v. Stephens* (1983), 462 U.S. 862, 880, 77 L. Ed. 2d 235, 252, 103 S. Ct. 2733, 2744.) The fact that the jury may have considered the convictions in finding the defendant eligible for the death penalty, therefore, could not affect its finding that the defendant was eligible for the death penalty.

As stated previously, at the second stage of the death penalty sentencing hearing, the jury may consider any evidence that is relevant and reliable in making its determining as to whether the defendant is to be sentenced to death, including the manner in which the crime was committed. In *People v. Lego* (1987), 116 Ill. 2d 323, the defendant argued that he was entitled to a new sentencing hearing because the jury had been instructed to consider several convictions which had been vacated. This court stated:

> "We do not agree with defendant that because the jury was allowed to consider the three [vacated] felony-murder convictions he was denied a fair sentencing hearing. The fact that defendant could be sentenced to only one death penalty does not alter his conduct in the commission of the offense, and we fail to see how it could be prejudicial for the jury which found him guilty to know of the verdicts." (*Lego*, 116 Ill. 2d at 344.)

Here, although the jury did not sit during the portion of the trial to determine guilt, the State, in attempting to prove that the defendant was eligible for the death penalty, presented, at the first phase of the sentencing hearing, testimony which was extensive and nearly identical to the evidence presented to the trial judge at the guilt phase. Mentioning the convictions to a jury which has heard the identical evidence which the judge heard in reaching the verdicts was not prejudicial. Furthermore, in considering whether to impose the death penalty, the jury clearly was entitled to consider any relevant and reliable evidence including the context in which the crime occurred. The fact that these murders occurred during the course of a home invasion and burglary clearly were relevant aggravating considerations.

In *People v. Holman,* on which the defendant relies for his proposition that a new sentencing hearing is required because the jury considered the vacated convictions, the court held that two felony-murder convictions based on burglary should be vacated and that the prosecutor and trial judge's emphasis of the convictions was likely to lead the jury astray in its sentencing considerations. The court cited this and other errors occurring at the closing argument of the sentencing hearing as reason for requiring a new sentencing hearing. In reaching its conclusion, the court stated that reminding the jury that the defendant was found guilty of murder and as an aggravating factor, that such murders were committed in the course of various felonies was permissible. What the court found objectionable was the fact that the prosecutor and the trial judge, on several occasions, emphasized that there were four convictions rather than simply that the defendant had been found guilty of murder committed in the course of one or more forcible felonies. The court found the conduct objectionable because the re-

marks might have led the jury to focus on the multiple convictions rather than on the finding of guilt and the aggravating factors. *People v. Holman* (1984), 103 Ill. 2d 133, 168.

Here, neither the prosecutor nor the trial judge stressed the number of convictions in such a way that the jury might have focused on the multiple convictions rather than on the findings of guilt and the aggravating factors. The prosecutor's mention of the convictions was limited to the first stage of the death penalty hearing and was made in such a manner as to remind the jury that the defendant had been convicted of murder and, as an aggravating factor, that the murders were committed in the course of a felony.

The defendant next argues that three prospective jurors were improperly excused for cause in violation of his sixth and fourteenth amendment rights to a fair and impartial jury as well as his eighth amendment right to a fair sentencing hearing. In *Witherspoon v. Illinois* the Supreme Court stated that in order to guarantee a fair and impartial jury it is impermissible to excuse for cause a prospective juror who expresses only general objections to the death penalty. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785, 88 S. Ct. 1770, 1777; *Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1766; *People v. Brisbon* (1989), 129 Ill. 2d 200, 224-25.) The standard for determining whether a prospective juror who opposes the death penalty should be excused for cause is whether the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (See *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852; *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.) The defendant contends that three pro-

spective jurors, Terry Harter, Harriet Ottenweller and Bernadine Anderson, were improperly excused for cause because none of them expressly or implicitly stated, during *voir dire*, that their views concerning the death penalty would have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions and their oath.

We would first observe that the defendant did not object to the excusing of two of the three excluded jurors (Harriet Ottenweller and Bernadine Anderson) nor did he raise the point in his post-trial motion. Generally, a failure to object at trial or in a post-trial motion constitutes a waiver of the right to raise the issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; see also *People v. Emerson* (1987), 122 Ill. 2d 411, 437; *People v. Brisbon* (1985), 106 Ill. 2d 342, 357.) It has been observed that a failure to object to the dismissal of a juror may have been a deliberate decision on defense counsel's part who, for his own reasons, may not have wanted the person as a juror. (See *Wainwright v. Witt* (1985), 469 U.S. 412, 437, 83 L. Ed. 2d 841, 859, 105 S. Ct. 844, 859; *Emerson*, 122 Ill. 2d at 437.) Nevertheless, we will consider this issue. The improper removal of a qualified juror for his or her purported opposition to capital punishment is not harmless error. See *Gray v. Mississippi* (1987), 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045 (*Witherspoon* violations constitute reversible constitutional error and cannot be subjected to harmless error review); *Emerson*, 122 Ill. 2d at 437.

Here, even if proper objections had been made, the record shows a proper basis for the exclusion of all three jurors under *Witherspoon*. We will first consider the exclusion of venire member Anderson, whose dismissal was not objected to. The record demonstrates the court's questioning of Anderson revealed her indecisiveness with

respect to the imposition of the death penalty. At the end of the questioning the following exchange occurred:

"THE COURT: I need to explore just a little further just what your feelings are in this matter. *** Are you saying to me that in any case, not just this one, but in any case you could not consider the death penalty? Now, I realize that you don't know now what decision you would arrive at here; at least I hope you don't because you haven't heard the evidence and the law to base it on. But, there are some people, of course, that would say that they could not impose the death penalty in any situation. Now, which is it you're telling me, if either one?

MS. ANDERSON: That's a hard question to answer at this stage. I know I've always been against the death penalty in the past; but sometimes I realize, too, that it might be a necessity, or whatever. It might be to the law's best advantage. But, I—

Q. I'm not asking you how you would decide this case.

A. No. I realize that, too. I really don't know whether I could or not. Sometimes I think I can and sometimes I think I can't. I'm just undecided on it. I don't know.

Q. When you say you think sometimes you can't, that means you just couldn't impose the death sentence no matter what the evidence and the law is?

A. That would probably most likely be the case, yes."

The judge's questioning of prospective juror Harriet Ottenweller, whose dismissal was not objected to, also indicated an indecisiveness with respect to imposition of the death penalty. The questioning ended in the following colloquy:

"THE COURT: *** What I'm asking you is would you consider a death penalty sentence?

MS. OTTENWELLER: I don't know if I'd have a hard time sleeping after I made that decision.

Q. Depending, perhaps, on what decision you made?

A. It's probably because I've always been a mother.

Q. Okay.

A. I just find—might find that very difficult.

Q. I'm not real sure what you're telling me. Are you saying that you just would not impose the death penalty in this case, no matter what the evidence, circumstances, or the law is? Is that what you're telling me?

A. I think maybe I am."

Finally, prospective juror Terry Hatter stated during *voir dire* questioning that his feelings about the death penalty were ambivalent. After extensive questioning regarding his views on the death penalty, the following exchange occurred:

"THE COURT: Have you ever been able to imagine a situation [where it would be proper to condemn someone to death]?

MR. HATTER: —you know, I want to say—I say yes, but I believe that I'm—it's morally wrong, okay. But, I would say that's, that's almost my theological vocation speaking, but I'm thinking too much on this because I don't want to make it. I guess I—I understand the need for the rule of law and the necessity of the State to set limits, and my position over the years has changed. At one point I was adamantly opposed to the death penalty, and at this time of my life, I am not as adamantly opposed. I'm not sure I'm adamantly opposed. I guess when I think of abuse and violence, particularly with children, when I—lynchings—those kinds of things at least stir me in ways that, that not in the past would see that as an option. Although I'm not certain that it would be right, I've at least considered it as an option. I'm making theological thoughts here, too, which are probably not helpful, but—

\*\*\*

Q. Would you go into a sentencing hearing as a juror with the feeling, 'I will not impose a death penalty unless they show me that it should be imposed?' Would that be your attitude?

A. I believe that is—as opposed to saying alternative where I would sign for a death penalty and would have to

be shown that would not be the case. I think I lean more toward not imposing the death penalty, yes.

Q. I think you can understand that we would seek jurors who would go into a sentencing hearing without any sort of favorite sentences at all.

A. I understand that.

Q. But you have a favorite one, I think, and that would be no death penalty unless shown otherwise.

A. Mm—mm. I think—I say I'm ambivalent, but I'm not, I couldn't be unbiased about that. I just, not my vocation."

The defendant argues that each of these jurors exhibited only a hesitancy about imposing the death penalty and that none of them expressly or implicitly stated that they opposed the death penalty in all cases or that their views concerning the death penalty would have impaired significantly their performance as jurors. The defendant further argues that the trial judge's questioning was flawed because he never specifically asked each juror whether his or her views regarding the death penalty would prevent or impair the performance of his or her duties as a juror.

Under *Witherspoon*, it is clear that a prospective juror cannot be automatically disqualified because of a general opposition to the death penalty. A prospective juror may not be excused unless his or her views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852; *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521; see also *People v. Kubat* (1983), 94 Ill. 2d 437, 499.) In determining whether a venireperson's views would impair his performance as a juror, this court has held that he or she need not express himself or herself with "meticulous preciseness" and that a trial judge need not follow a "set catechism" in posing questions to a venireper-

son. (*People v. Szabo* (1983), 94 Ill. 2d 327, 354; *People v. Gaines* (1981), 88 Ill. 2d 342, 356.) Furthermore, a potential juror's remarks must not be considered in isolation but as a whole, and it must be clear that the juror examined is willing to set aside his own belief in deference to the rule of law. *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758.

Here we find that although each of the jurors at one point made statements indicating that he or she was willing to impose the death penalty, the responses, as a whole, demonstrate that ultimately they would likely not consider the facts and circumstances in deciding whether to impose the death penalty. Looking at each of these jurors' answers as a whole indicates more than a mere hesitancy to impose the death penalty, but instead indicates that his or her views would prevent or substantially impair his or her performance as a juror.

Prospective juror Anderson, after expressing hesitancy about imposing the death penalty, said in response to the trial judge's direct question as to whether she could ever impose the death penalty that she "probably most likely" could not impose a death sentence no matter what the evidence and the law was. The fact that a potential juror prefaces an answer with "probably" or the like does not render his answer ambiguous. (See *People v. Gaines* (1981), 88 Ill. 2d 342, 356; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 431; *People v. Silagy* (1984), 101 Ill. 2d 147, 166-67.) Given the juror's answers as a whole and the trial judge's superior position to evaluate what a prospective juror intends to convey, the circuit court did not err in excusing her.

Prospective juror Ottenweller also expressed serious doubts about the death penalty. Finding her answers somewhat inconsistent, the judge specifically asked her whether she was telling him that no matter what the evidence, circumstances or the law, she would not impose

the death penalty, to which her answer was, "I think maybe I am." As stated previously, the fact that a juror prefaces her answer with "I think" is not an indication that her answer was ambiguous. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 431; *People v. Silagy* (1984), 101 Ill. 2d 147, 167.) Also, the fact that some of Ottenweller's earlier responses might have indicated a willingness to consider the death penalty cannot be considered in isolation. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 358.) Considered as a whole, we hold that the circuit court did not err in excusing prospective juror Ottenweller for cause. In the case of both Anderson and Ottenweller, it is also to be noted that the trial judge specifically and directly asked the relevant *Witherspoon* questions.

The exclusion of venireperson Hatter also meets the *Witherspoon* standard. Hatter repeatedly, during *voir dire*, voiced his moral and theological objections to the death penalty, finally stating that although he had earlier said he was ambivalent, he could not be unbiased in a sentencing hearing. As stated, the standard for excusing a juror for cause because of his opposition to capital punishment is whether his views would prevent or substantially impair his performance as a juror in accordance with his instructions and his oath. Hatter's professed inability to remain unbiased on theological grounds indicates that he would not be able to meet this requirement. Additionally, Hatter's responses throughout the entire *voir dire* fall short of the requirement articulated by the Supreme Court in *Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766, that potential jurors who believe that the death penalty is unjust "state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Here, prompted by the judge's questioning during *voir dire*, prospective juror Hatter grappled with trying to harmonize legal standards with

his moral and theological views but ultimately concluded that, given his theological background (he was a minister and indicated that he had studied theological texts on such issues the night before), he could not be unbiased in imposing the death penalty. Finally, we emphasize that when a potential juror's answers are unclear or inconsistent, as they were here, the trial court's judgment is entitled to deference in removing a potential juror for cause, "given the superior position of the trial judge to gauge the meaning of the prospective juror's responses to the questions that were asked." (*People v. Emerson* (1987), 122 Ill. 2d 411, 439; see also *People v. Collins* (1985), 106 Ill. 2d 237, 280.) Accordingly, we hold that prospective jurors Ottenweller, Anderson and Hatter were properly excused for cause.

The defendant next argues that given the statutory and nonstatutory mitigating factors in this case, the penalty of death was inappropriate and excessive in violation of the eighth and fourteenth amendments. He asks that the court vacate the death sentence and impose a natural life imprisonment without the possibility of parole. In determining whether a death sentence is proper in a particular case, we must consider the character and record of the individual offender and the circumstances of the particular offense. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *Sumner v. Shuman* (1987), 483 U.S. 66, 73-74, 97 L. Ed. 2d 56, 64, 107 S. Ct. 2716, 2721; *People v. Sanchez* (1986), 115 Ill. 2d 238, 274; *People v. Free* (1983), 94 Ill. 2d 378, 428.) A death sentence is appropriate if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances. (*Sanchez*, 115 Ill. 2d at 274; *Free*, 94 Ill. 2d at 428-29; *People v. Carlson* (1980), 79 Ill. 2d 564, 587.) Because of our responsibility to evaluate the propriety of the imposition of the death penalty,

we have not hesitated to vacate an improperly imposed death sentence. *People v. Johnson* (1989), 128 Ill. 2d 253; *People v. Walker* (1982), 91 Ill. 2d 502; *People v. Carlson* (1980), 79 Ill. 2d 564.

Upon review of the record, the imposition of the death penalty was not unwarranted in this case. The evidence showed that the defendant intentionally shot each of the victims several times at close range during the course of a home invasion and burglary. The murders were clearly cold-blooded and deliberate. The defendant points out, however, that expert witnesses established that a personality disorder combined with excessive drinking, caused him to act under an "extreme mental or emotional disturbance" at the time the offense was committed. Extreme mental or emotional disturbance is a statutory mitigating factor under section 9—1(c)(2) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)). Both psychologists who testified that the defendant was suffering from an emotional disturbance, however, also testified on cross-examination that they examined the defendant approximately a year after the incidents occurred and that the defendant was able, at the time of the offense and later, to appreciate the criminality of his acts. Both testified that the defendant showed no remorse for his actions.

The defendant also argues that the evidence of extreme emotional disturbance is not the only mitigating evidence in the record. He points to evidence that he does not have a significant criminal history, that he had a severe alcohol and drug problem and that he had a disturbed childhood. While each of these factors are relevant to the sentencing determination, their existence does not necessarily preclude imposition of the death penalty. While defendant's earlier criminal record is not extensive, he certainly had a history of criminal conduct. Most notable, of course, was the killing of James Gordon

in Missouri and the conviction for the attempted murder and sexual assault of Mary Lou Quayle in Nevada. The record also reveals a burglary conviction and a disorderly conduct conviction.

The defendant also argues that he introduced sufficient evidence to suggest that he had been drinking and probably was intoxicated at the time of the killing. We have found alcoholism to be a mitigating factor sufficient to reduce a sentence of death to imprisonment in *People v. Gleckler* (1980), 82 Ill. 2d 145, and *People v. Walcher* (1969), 42 Ill. 2d 159. In both of those cases the evidence established that the alcoholic defendant had been drinking and probably was intoxicated at the time of the killing; that the defendant did not act alone in perpetrating the offense and, finally, that only one killing was involved. Here there was evidence that although the defendant may have been drinking heavily before the commission of the crimes, that he was in control of his faculties at the time of the offense. Mr. Matthews, a clinical psychologist, testified on cross-examination that the defendant was able to understand the consequences of his actions at the time he murdered Claude and Alta Brown. The last person to see the defendant before the killings, Judith Oller, was unable to say that the defendant was intoxicated when he left the Kings Den lounge at 11 p.m. on the night of the murders. Further, both the McDowell residence and the Brown residence were left in good order. There was no evidence that the defendant was not in control of his behavior or that he conducted anything other than a methodical search of the premises. Further distinguishing this case from *Gleckler* and *Walcher* is the fact that the defendant was the sole perpetrator of the crime and the fact that he committed numerous offenses, including three murders and an attempted murder, over the course of several days. Testimony of witness who had an opportunity to

observe the defendant after he left Illinois and while he was committing the crimes in Nevada supported the contention that the defendant was in control of his faculties. Numerous witnesses testified that they did not believe that the defendant was drunk either at the time of the armed robbery or at the time he attempted to kill Mary Lou Quayle in Nevada.

The defendant also points to the fact that his childhood was a troubled one. While evidence indicated that defendant's father was an alcoholic who beat and abused his mother and sisters, defendant did have a warm relationship with his mother and sisters and with his stepfather. As was stated in *People v. Gacy* (1984), 103 Ill. 2d 1, 102, that one has an abusive and disapproving father obviously does not excuse his committing murder.

Of importance here too is that the crime was in no way triggered by any independent provocation. (See *People v. Sanchez* (1986), 115 Ill. 2d 238, 276; *People v. Carlson* (1980), 79 Ill. 2d 564, 590.) The crimes were deliberate and cold-blooded. There is simply no contention that the jury failed to consider any of these possible mitigating factors. A sentencing decision in a capital case represents a balancing process in which the gravity of the crime must be weighted against whatever mitigating factors exist. (*People v. Gacy* (1984), 103 Ill. 2d 1, 102; see also *People v. Brownell* (1980), 79 Ill. 2d 508.) The trial judge sufficiently instructed the jury to consider and weigh all mitigating and all aggravating factors and there is no evidence that the jury did not follow those instructions. Considering the cold-blooded nature of these murders and the string of criminal activity that followed, there are sufficient grounds to support the jury's finding that the mitigating factors did not outweigh the aggravating factors. It cannot be said that the sentence was imposed on other than a reasoned basis and we will not

disturb the verdict of the jury. *People v. Walker* (1985), 109 Ill. 2d 484, 507.

The defendant next argues that he was denied a fair sentencing hearing under our law and under the eighth and fourteenth amendments because, at the first stage of the sentencing hearing, the prosecutor presented the following irrelevant evidence: (1) the testimony of the victims' daughter, which included the victims' ages and birthdays; (2) life photographs of the victims; and (3) evidence that the defendant allegedly sexually assaulted one of the victims. The defendant argues that this testimony served no legitimate function and was introduced solely in an effort to evoke sympathy for the victims.

The defendant did not object to any portion of Ms. Scheffert's testimony, however, and his failure to object constitutes a waiver of the issue on appeal. (*People v. Lyles* (1985), 106 Ill. 2d 373, 392.) The defendant asks us, nonetheless, to address the issue to determine whether it amounted to plain error. We do not consider the introduction of Scheffert's testimony error, and even if it was error, it is not plain error.

Evidence regarding the impact of the victim's death on the victims' family is generally improper. Common sense tells us, however, that murder victims do not live in a vacuum and that in most cases they leave behind family members. (*People v. Free* (1983), 94 Ill. 2d 378, 415.) Where testimony establishing that the deceased left a spouse or family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material to the defendant's guilt or to the punishment he should receive, its admission is prejudicial and may constitute reversible error. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 453.) In *Ramirez* it was held that the prosecutor's calling the victim's widow to testify was error because calling her served no purpose other than to show that the victim left a widow. The court further

noted that the widow's testimony was elicited in such a manner as to cause the jury to believe that the fact that the deceased left a widow was material to the determination of his eligibility for the death penalty. See also *People v. Davis* (1983), 97 Ill. 2d 1, 27 (testimony was improper which established that victim's wife had a baby the day after the victim's murder); *People v. Bernette* (1964), 30 Ill. 2d 359, 371 (prosecutor asked victim's widow questions concerning her children including their ages and reiterated the testimony at the closing argument); *People v. Simms* (1988), 121 Ill. 2d 259, 271-72 (victim's parents, brother and husband testified during the sentencing hearing concerning their grief and deep sense of loss and as to the effect of the victim's death on her family, which included several small children); *People v. Hope* (1986), 116 Ill. 2d 265 (intentional repeated references to victim's family).

Here, the jury could infer from Scheffert's presence on the stand that the victims had a daughter, but her testimony contained no reference to the fact that the victim left a family or to the effect the victim's death had on the family. (*Cf. People v. Davis*, 97 Ill. 2d 1; *People v. Bernette*, 30 Ill. 2d 359; *People v. Simms*, 121 Ill. 2d 259.) Further, Scheffert's testimony was introduced because it was relevant to several of the factors the State was attempting to prove at the eligibility stage. She testified that she was called to her parent's home the morning after the murder by Leon Woolsey, a neighbor who feared that the Brown residence, like the McDowell residence, had been broken into. She identified photos of the victims and a photograph of the victim's home, which was relevant to the State's contention that the defendant was eligible for the death penalty because the murder was committed during the course of a home invasion. She also identified for the jury the Brown's truck, which was stolen from the victim's residence and was

relevant to the State's contention that the defendant was eligible for the death penalty because the murder was committed during the course of a burglary. Scheffert's testified as one of many witnesses for the State at the eligibility stage and her testimony arguably was relevant to several of the eligibility issues and clearly was not introduced for the purpose of inflaming the jury.

Even if it were assumed that the introduction of Scheffert's testimony was erroneous because it served no purpose in the eligibility phase aside from indicating that the victims had left a family, the error was not plain error. An error will be considered plain error when the evidence is evenly balanced or when the nature of the error is such as to deprive the accused of his constitutional right to a fair sentencing hearing. (*People v. Lucas* (1981), 88 Ill. 2d 245, 251.) Here the evidence of defendant's eligibility for the death penalty was plain and not closely balanced. The record clearly shows the defendant was over 18 years of age when he committed the murders and that he committed multiple murder. Further, any error in Scheffert's testimony was not substantial enough to deprive the defendant of a fair trial, as the irrelevant information was not stressed or emphasized.

Scheffert's testimony also included the identification of the life photos of the victims. This court in *People v. Rogers* (1988), 123 Ill. 2d 487, held that the introduction of life photographs at the first stage of the death penalty hearing was, although improper, harmless error. The defendant here did not object to the identification and the issue has been waived on review. The defendant's contention that the error was plain error is rejected as the evidence establishing the defendant's eligibility for the death penalty was not closely balanced and because allowing the life photos was not an error so substantial as to deny the defendant a fair sentencing hearing.

Finally, the defendant objects to Scheffert's testimony regarding the victims' dates of birth and the prosecutor's mention of it during closing argument at the second stage of the sentencing hearing. This evidence regarding the characteristics of the victims was not relevant to the eligibility issue or to the imposition of the death penalty. The defendant argues that the statements caused the jury to improperly focus its attention on something other than the defendant himself and that the victim impact testimony was in violation of *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, and *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207. In both *Booth* and *Gathers* the Supreme Court held that evidence which tends to shift the focus from the defendant to the victim is not admissible. The defendant did not object to Scheffert's testimony or to the prosecutor's reference to the victims' ages. He, therefore, waived any challenge for purposes of this appeal, and we do not find the error here to be plain error, as the defendant asserts. As stated previously, the evidence was not closely balanced and Scheffert's testimony regarding the dates of birth of the victims and the prosecutor's reference to it, although improper, was isolated and inconspicuous. (Compare *Booth* and *Gathers*, where the victim impact evidence was extensive and was emphasized by the prosecutor.) We find no likelihood that the jury's focus was shifted from proper considerations here or that the improper reference to the victims' ages was sufficient to deny the defendant his right to a fair trial.

Finally, the defendant argues that the prosecutor presented evidence of the sexual assault of Mrs. Brown and that because felony murder based on sexual assault was not charged such evidence had no pertinency at the eligibility phase of the sentencing hearing other than to evoke an emotional response from the jury. The defend-

ant also objects to the prosecutor's mention of the sexual assault during closing argument.

The first reference to the sexual assault was contained in the coroner's testimony. The coroner was called to testify as to the physical injuries of the victims and as to the cause of death. During the coroner's description of the injuries received by Alta Brown, he testified that his examination revealed a 1½ centimeter tear of the vaginal wall. Looking at the record as a whole, this comment was clearly incidental to properly illicited testimony. Its mention was made in a listing of all the injuries received by the victims and was in no way designed to inflame the jury.

The subsequent references to the alleged sexual assault were extracted from the defendant's confession and were initiated by defense council in an attempt to discredit the defendant's confession by showing that his answers to interview questions were prompted by the questions of Detective Wood. The prosecutor's comment on evidence that the defendant himself was responsible for introducing could not be found to have been introduced by the prosecution solely to evoke the emotional response of the jury.

Although the introduction of the life photos, the testimony as to the victim's birthdays and the reference to the sexual assault was not relevant to the defendant's eligibility for the death penalty, it was incidental to evidence or testimony which was properly introduced. Further, the testimony was not elicited in such a manner as to suggest that the evidence was material and the prosecutor did not dwell on the testimony or try to appeal to the jury's sensitivities with the improper evidence. Thus, the defendant is not entitled to a new sentencing hearing because of the jury's potential consideration of this evidence.

The defendant finally argues that defense counsel's failure to object to the above evidence and testimony was a deficiency which amounts to ineffective assistance of counsel under the sixth and fourteenth amendments. He says that because the evidence was closely balanced there is a reasonable probability that counsel's deficient performance affected the outcome of the sentencing hearing. To establish a claim of ineffective assistance of counsel, the defendant has to prove both that his attorney "made errors so serious that he was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that it is reasonably probable that these errors so prejudiced defendant as to deprive him of a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504.) A court deciding a claim of ineffective assistance of counsel may advance directly to the second part of the *Strickland* test, and if it finds that the defendant was not prejudiced by the allegedly incompetent conduct of his attorney, the court may rule on the claim without first finding that the attorney's conduct constituted less than reasonably effective assistance. (*People v. Johnson* (1989), 128 Ill. 2d 253, 271.) We analyze the defendant's claim in this manner. We find that defendant has failed to establish a reasonable probability that he was prejudiced by his attorney's conduct. There is no indication here, given the evidence presented, that had counsel objected, the outcome of the defendant's sentencing hearing would have been any different.

The defendant next argues that pursuant to a detainer agreement, Illinois had only temporary custody of the defendant for purposes of trial and that he should be returned to Nevada to complete his sentence. The defendant argues that the State's failure to comply with the terms of the agreement is a violation of equal protec-

tion and due process. While serving four life sentences in Nevada for the sexual assault and attempted murder of Mary Lou Quayle, the defendant filed a request for "Disposition of Indictments, Information or Complaints" pending in the State of Illinois. The detainer agreement entered into by the defendant is governed by the Interstate Agreement on Detainers, which has been adopted in Illinois. (Ill. Rev. Stat. 1985, ch. 38, par. 1003—8—9.) As provided in article III of the agreement on detainers the agreement executed by the defendant provided:

"I hereby agree that this request will operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against me from your state. I also agree that this request shall be deemed to be my waiver of extradition with respect to any charge or proceeding contemplated hereby or included herein, and a waiver of extradition to your state to serve any sentence there imposed upon me, after completion of my term of imprisonment in this state. I also agree that this request shall constitute a consent by me to the production of my body in any court where my presence may be required in order to effectuate the purposes of the Agreement on Detainers and a further consent voluntarily to be returned to the institution in which I now am confined."

The defendant argues that pursuant to this agreement, Peoria County accepted only temporary custody of him and that the interstate agreement on detainers required that he be returned to Nevada to serve his sentence. Article V(e) provides "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state." (Ill. Rev. Stat. 1985, ch. 38, par. 1003—8—9.) He argues that the detainer agreement makes no provision which would allow Illinois to circumvent this rule.

This issue was addressed by this court in *People v. Guest* (1986), 115 Ill. 2d 72. In *Guest*, the defendant was

serving a life term in Missouri and was awaiting service of a consecutive 35-year sentence in Missouri. The defendant had also been sentenced to a term of years in California. The defendant was tried in Illinois for murder pursuant to a detainer agreement and was sentenced to death. The defendant argued that Illinois' custody of him was temporary and that pursuant to the terms of the detainer agreement he should have been returned to Missouri to complete his term of imprisonment. Illinois' failure to comply with his agreement, the defendant argued, violated his due process and equal protection rights.

This court in *Guest* recognized that the agreement on detainers provides for the return of a prisoner to a sending State at the earliest practicable time consonant with the purpose of the agreement, but held that these provisions were not intended to apply where a sentence of death is imposed by the receiving State. (*Guest*, 115 Ill. 2d at 114-15.) Because the statute appears to encourage the expeditious and orderly disposition of untried indictments, informations or complaints which tend to obstruct programs of prisoner treatment and rehabilitation, a defendant who receives the death sentence in the receiving State has no such interest. The court in *Guest*, therefore, directed the Attorney General, after providing notice to the defendant, to communicate with the appropriate authorities in Missouri and California to ascertain if those States would waive whatever rights they may have to penal custody of the defendant.

We find *People v. Guest* in point and, therefore, controlling. Included in the record in the present appeal is an agreement of the type contemplated by *Guest*. The agreement, signed by the governors of Illinois, Missouri, and Nevada, provides for the return of the defendant to Nevada, to serve the life sentence previously imposed there, only in the event that the defendant is not under sentence of death in either Illinois or Missouri. The

agreement further provides for the defendant's temporary transfer from Illinois to Missouri to face trial on capital charges in that State, and for the defendant's return to Illinois upon the completion of the Missouri proceedings. Subject to any future arrangement between Illinois and Missouri, the agreement permits Illinois to retain custody of the defendant so long as he is under sentence of death in this State.

The defendant argues that such an agreement, is void and thus unenforceable. The argument is unpersuasive. The Act provides for cooperative procedures between the sending and receiving States and provides for instances when the States can agree to a course of action which is not provided for in the Act. There is nothing in the Act which prohibits such agreements. (See, *e.g.,* *Moon v. State* (1988), 258 Ga. 748, 751-52, 375 S.E.2d 442, 447 (where the Georgia Supreme Court upheld an agreement between the sending State and the receiving State that defendant was to remain in the receiving State if the death penalty was imposed).) Thus, under *Guest* and *Moon,* the executive agreement entered into by Illinois, Missouri, and Nevada may be given effect notwithstanding the provision in the detainer agreement executed by the defendant requiring his return to the sending State, for completion of the term of imprisonment imposed there, before service of a sentence rendered in the receiving State.

The defendant argues too that the prosecutor made several improper comments during closing argument at the second stage of the sentencing hearing which prejudiced the defendant and denied him a fair sentencing hearing under State law and under the eighth and fourteenth amendments.

The defendant complains first that the prosecutor improperly argued that the defendant might kill a guard or another inmate if he were sentenced to natural life in

prison. The prosecutor, referring to threats the defendant made after he was taken into custody and prior to trial here, stated:

"Because in jail, charged with multiple murders and even later convicted of multiple murders, what does he do, he threatens to kill people, including the guards that are there to watch him, and the other inmates. Yes, Ladies and Gentlemen, charges were not filed in those cases. What is another sentence on top of the life sentences to this defendant?

While it hasn't happened yet—he hasn't killed any guards out there—shouldn't we take his threats seriously? Hasn't he shown over and over again that he can and will kill?"

The defendant did not object to the comments at trial or in a post-trial motion and, therefore, the issue on appeal has been waived. The defendant, however, asks us to consider the comments under the rule of plain error. (*People v. Lucas* (1981), 88 Ill. 2d 245.) This court has held that speculating on the possibility that the defendant might commit future crimes if he is not executed may cause the jury to focus upon a speculative possibility that may or may not occur and that is immaterial to the jury's consideration of aggravating and mitigating factors. (*People v. Hooper* (1989), 133 Ill. 2d 469, 500; *People v. Gacho* (1988), 122 Ill. 2d 221; *People v. Walker* (1982), 91 Ill. 2d 502, 515.) In *Hooper* this court stated that speculating that the defendant, if not executed, might kill a prison guard was inflammatory and was not cured by the court's sustaining of defense counsel's objection to the comments. *People v. Hooper*, 133 Ill. 2d at 500.

Each instance of error of this kind must be examined on the facts of the case. We do not find the comment, given the record here and the closing argument as a whole, to be plain error. The first requirement under

which plain error can be found is that the evidence is closely balanced. This prong of the plain error rule is not applicable because, as we have stated previously, the evidence is not closely balanced. The second circumstance under which the plain error rule can be applied is if the error is so fundamental and of such magnitude that the accused was denied a fair hearing. Plain error is applicable where it is necessary to preserve the integrity of the judicial process and to insure a fair hearing. Here, considering the State's Attorney's closing argument in light of the whole record and the defendant's conduct while in custody, we do not consider his comments were so inflammatory that they denied the defendant his right to a fair hearing. (See *People v. Jones* (1982), 94 Ill. 2d 275, 299.) The prosecutor's comments, although improper, were made against a background of testimony of several prison guards that the defendant had threatened prison guards and other inmates. Such testimony was admissible in aggravation and could be properly commented on in closing argument. *People v. Perez* (1985), 108 Ill. 2d 70, 87; *People v. Stewart* (1984), 105 Ill. 2d 22, 68-69.

We judge that the prosecutor's comments were distinguishable from comments made in cases in which this court has set aside the defendant's death sentence because of improper comment. In *People v. Gacho* (1988), 122 Ill. 2d 221, on which the defendant relies heavily, the death sentence was set aside because of the prosecutor's repeated comments on the possibility of parole, though he knew there was no possibility of parole, together with the other objectionable comments including a comment on the possibility of future violence against guards or inmates. The court held that the repeated comments diverted the jury's attention from the aggravating and mitigating factors before it. *People v. Gacho*, 122 Ill. 2d at 257; see also *People v. Hooper*, 133 Ill. 2d at 500 (where the court held the prosecutor's speculative com-

ments that the defendant may kill a guard, together with comments that the defendant might be paroled, were speculative and immaterial to the jury's consideration of aggravating and mitigating factors).

Here in contrast, the prosecutor's comments were not naked speculation and immaterial to the jury's consideration of relevant aggravating and mitigating factors. We do not conclude the prosecutor's comments were of such substantial error as to threaten the integrity of the judicial process or to deny the defendant a fair trial.

The defendant next says that the prosecutor, in closing argument, made an unfounded assumption regarding what might have occurred during the McDowell home invasion had Mrs. McDowell been at home. The prosecutor said:

> "He went to the home of Mary McDowell. And thankfully, Ladies and Gentlemen, Mrs. McDowell was not home because we, I think, have a good idea of what would have happened to her if she would have been home that night instead of going to her daughter's."

A prosecutor may not argue assumptions or statements of fact which are not based upon any evidence. (*People v. Albanese* (1984), 104 Ill. 2d 504, 519; *People v. Beier* (1963), 29 Ill. 2d 511, 517.) The defendant, however, made no objection to these comments during trial or in a post-trial motion and he, therefore, has waived the issue. The defendant asks us to consider the comments as plain error. We cannot judge that there was error in the prosecutor's comments because they were sufficiently related to evidence introduced at trial (the defendant had cut the phone lines before entering the McDowell residence). In *People v. Halteman* (1956), 10 Ill. 2d 74, 83, this court stated that counsel may properly comment upon the facts or upon legitimate inferences deduced therefrom. Even if there was error in the prosecutor's comments, the error was not plain error. As stated the evi-

dence was not closely balanced and we do not consider the error, if at all, of such magnitude that the accused was denied a fair hearing.

The defendant states too that a comment by the prosecutor regarding the defendant's criminal conduct in Reno, Nevada, was also error. The comment was:

> "Ladies and Gentlemen, I think its reasonable to assume that but for the Reno Police Department, the killing would have not ended there."

This comment, like the comment regarding Mary McDowell, was reasonably based on evidence introduced at the trial. The evidence showed that after attempting to kill Mary Lou Quayle, the defendant left her for dead and proceeded to reload his revolver.

The defendant argues too that the defense counsel's failure to make objections at trial constituted ineffective assistance of counsel and deprived him of a fair sentencing hearing. As stated, to prove ineffective assistance of counsel, the defendant must show that counsel's performance was so deficient as to deny him his sixth amendment right to a fair trial and that it is reasonably probable that these errors so prejudiced the defendant as to deprive him of a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 688, 694, 80 L. Ed. 2d 674, 697-98, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) To demonstrate prejudice the defendant must show a reasonable probability that but for counsel's professional errors, the result of the proceedings would have been different. Here, the defendant has failed to show or persuasively argue that the result of the proceeding would have been different had his counsel made the objections. Given the evidence here it is not likely that the defendant could make such a showing.

The defendant next argues that he was denied a fair sentencing hearing under our law and under the eighth and fourteenth amendments because his tendered in-

struction concerning the applicability of mercy and compassion was refused and the resulting instruction as a whole may have led the jury to believe that they could not consider sympathy, mercy or compassion for the defendant. In *People v. Sanchez* (1986), 115 Ill. 2d 238, 269-70, we upheld a trial judge's refusal to tender an instruction almost identical to the one here ("In considering the death penalty, you may, if you wish to do so, consider whether or not you wish to extend mercy to the defendant."). The court held that the refusal to instruct the jury as requested was not error because the court instructed the jury that it could consider "any other mitigating factors." Because the defense attorney offered sympathetic testimony from members of the defendant's family and argued for mercy in his closing statement, we held that the jury was free to consider mercy or any other mitigating factor despite the absence of a specific instruction to do so. See also *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837.

Here the court instructed the jury to consider "any other reason supported by the evidence why the defendant should not be sentenced to death" and defense counsel argued in closing that the jury should consider mercy for the defendant. Although the defendant's tendered instruction was rejected, we consider the instruction actually given sufficient to allow the jury to consider sympathy or mercy for the defendant. The holding in *People v. Sanchez* was proper and is controlling.

The defendant complains also that he was denied a fair sentencing hearing under our law and under the eighth and fourteenth amendments because the trial court refused the defendant's tendered instruction which enumerated both statutory and nonstatutory mitigating factors. The defendant argues that the instruction given to the jury which specifically enumerated statutory mitigating factors without specifically enumerating nonstatu-

tory mitigating factors placed unwarranted emphasis only on the statutory factors and may have precluded the jury from giving full effect to nonstatutory factors.

This court has considered and rejected this argument on several occasions. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 40; *People v. Stewart* (1984), 105 Ill. 2d 22, 70; *People v. Sanchez* (1986), 115 Ill. 238, 269-70.) In *People v. Spreitzer*, this court held that a defendant's request for instructions on nonstatutory mitigating factors was properly refused so long as the court instructs the jury to consider any facts or circumstances that provide reason for imposing a penalty other than the death penalty. This court stated in *Spreitzer*:

> "Rather than requiring court and counsel to present the jury with a detailed laundry list of nonstatutory mitigation, we think it better to allow the court to instruct only on specific instances of statutory mitigation, while instructing the jury that they may consider any other nonstatutory mitigating factor." (*People v. Spreitzer*, 123 Ill. 2d at 41.)

Here, the defendant's tendered instruction was properly rejected and the instruction given was clearly sufficient under *Spreitzer*. The jury was instructed:

> "Mitigating factors include: first any or all of the following if supported by the evidence; the defendant has no significant history of prior criminal activity; the murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not sufficient to constitute a defense to the prosecution; second, any other reason supported by the evidence why the defendant should not be sentenced to death."

The defendant cites *People v. Johnson* (1979), 298 N.C. 47, 257 S.E.2d 597, where the court held that an accused is entitled to a jury instruction which includes any nonstatutory mitigating factors supported by the evidence and he asks us to reconsider the holdings in *Peo-*

*ple v. Spreitzer* and *People v. Stewart.* Here the defendant offered evidence of nonstatutory mitigation and the jury was instructed to consider all of that evidence in weighing the aggravating factors against the mitigating factors. The jury clearly was not precluded from considering any aspects of the defendant's character or record in mitigation.

The defendant says that the introduction at the second stage of the death penalty hearing of evidence of his window-peeping and public-indecency offenses for which he was never prosecuted or convicted, violated his eighth and fourteenth amendment rights to a fair trial. This court has held that evidence pertaining to a defendant's prior misconduct is admissible although the misconduct may not have resulted in a prosecution or conviction if it is reliable, relevant and subject to cross-examination. (*People v. Johnson* (1989), 128 Ill. 2d 253, 284; *People v. Lego* (1987), 116 Ill. 2d 323, 346; *People v. Sanchez* (1986), 115 Ill. 2d 238, 276; *People v. Brisbon* (1985), 106 Ill. 2d 342, 364-65.) Evidence of prior misconduct is relevant and reliable if it bears on the likelihood or unlikelihood that the defendant would commit other offenses, it appears trustworthy, the defendant had the opportunity to face and cross-examine the witnesses, and the accuracy of the information was not challenged. (*People v. Johnson*, 128 Ill. 2d at 284-85, citing *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.) Under this test the evidence presented in aggravation against the defendant was admissible.

The remainder of the defendant's arguments are general constitutional challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). Each of these issues has been previously considered and rejected by this court. We have repeatedly rejected the defendant's first argument that the statute violates the eighth and fourteenth amendments to the United States

Constitution because it does not require that the State prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death penalty. See *People v. Thomas* (1990), 137 Ill. 2d 500, 542; *People v. Young* (1989), 128 Ill. 2d 1, 59-60; *People v. Kubat* (1983), 94 Ill. 2d 437, 504; *People v. Brownell* (1980), 79 Ill. 2d 508, 531.

We have also repeatedly rejected the defendant's second contention that the statute is unconstitutional because it puts the burden on the defendant, after he or she has been found eligible for the death penalty, to prove that the death penalty should not be imposed. The defendant argues that a rebuttable mandatory presumption in favor of a death sentence is created which violates the eighth amendment because a sentence of death may be imposed without an individualized determination that it is appropriate. See *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Coleman* (1989), 129 Ill. 2d 321, 349; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69.

As we stated in *People v. Fields*, 135 Ill. 2d at 76, this court has held that neither the State nor the defendant bears the burden of proof at the second stage of the sentencing hearing. (*People v. Olinger* (1986), 112 Ill. 2d 324; *People v. Owens* (1984), 102 Ill. 2d 88.) The weighing process which takes place after an aggravating factor is established obviates any need to assign the burden of presenting factors in mitigation. *People v. Morgan* (1986), 112 Ill. 2d 111, 148; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.

The defendant next complains of jury instructions that he says erroneously informed the jury that the defendant bore the burden of persuasion. The court here instructed the jury that it should impose the death penalty "if you unanimously find that there are no mitigating factors sufficient to preclude imposition of the death

penalty." The defendant argues that the instructions and the comments of the prosecutor demonstrated "a real probability" that the jury erroneously believed that death was the appropriate penalty, unless the jury could affirmatively find mitigating factors sufficient to preclude it. See *Gaines v. Thieret* (1987), 665 F. Supp. 1342.

The defendant did not object to the instructions at trial or in a post-trial motion and the challenge is, therefore, waived. Even if the challenge was not waived, we have already addressed the argument in *People v. Thomas* and held that such instructions and statements do not misstate the law or deny the defendant a fair trial. *Thomas*, 137 Ill. 2d at 539-40.

Finally, the defendant argues that although various provisions of the death penalty statute (including the prosecutor's discretion to seek the death penalty, the absence of a requirement for pretrial notice, the limited comparative proportionality review which this court undertakes of death sentences, the absence of a requirement for a written finding by the sentencer, the absence of a requirement limiting evidence of aggravating circumstances to that known to the defendant prior to trial, the absence of a burden of proof on the prosecution and preclusion of the sentencer's exact range of sentences applicable if the death penalty is not imposed) have been upheld as constitutional, collectively they function to make the Illinois capital sentencing process unconstitutionally arbitrary and capricious. This issue has also been raised before and rejected by this court. (See *Thomas*, 137 Ill. 2d at 549-50; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.) In *Phillips* we observed, "[i]f all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional."

The defendant raises no new arguments here which would persuade us to reconsider our holding that our death penalty statute is constitutional.

For all the reasons given, the judgments of conviction and sentence for intentional murder are affirmed; the felony murder convictions are vacated. The clerk of this court is directed to enter an order setting Tuesday, March 19, 1991, as the date on which the death sentence, entered in the circuit court of Peoria County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which the defendant is contained.

*Judgment affirmed in part and vacated in part.*