THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES ROBERT EDWARDS, Defendant-Appellant.

Second District   No. 2—90—0023

Opinion filed February 4, 1992.

Robinson & Skelnik, of Elgin (Mary Robinson, of counsel), for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, James Robert Edwards, appeals from his conviction of aggravated criminal sexual assault. Following a bench trial in the circuit court of Kane County, defendant was sentenced to 15 years' imprisonment. The issues presented for review are whether: (1) the court abused its discretion when it found the five-year-old victim competent to testify about events that occurred at age three; (2) the court

erred in barring expert testimony offered by defendant; (3) the admission of certain out-of-court statements violated the *ex post facto* clause; (4) the court erred in admitting hearsay; and (5) the court relied on an improper factor when sentencing defendant. We affirm in part, vacate in part, and remand.

Defendant was charged with aggravated criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1).) The indictment alleged that between September 1987 and January 1988 defendant committed an act of sexual anal penetration with his son, RBL, who was under 13 years of age when the act was committed.

RBL was born to defendant and his wife, JL, on August 20, 1984. Defendant and JL were divorced in January 1986; JL married again in February 1986. After the divorce, RBL lived with JL. Under the terms of the divorce decree, defendant had rights to visitation with RBL.

On direct, JL testified that RBL developed unusual behaviors around the end of 1986 and early 1987. According to JL, RBL masturbated excessively, was obsessed with being naked, and would smash his penis up against the faces of people on television. RBL would also wake up in the middle of the night vomiting or having nightmares. He complained of stomachaches and had problems with bowel movements. He would refuse to eat for days at a time and then eat until he vomited. JL further testified that RBL acted in a sexual manner with other children. She caught him fondling them several times. Sometimes he put tape on his penis and rectum. RBL would also push JL's head down towards his penis and say, "go ahead and taste it Mommy, it's okay."

JL asserted that, during the period between September 1987 and January 1988, RBL was reluctant to go with defendant when he came to exercise his visitation rights. JL testified that on these occasions RBL would lock himself in his room, or hide between JL's legs, or curl up in a fetal position and say that "Daddy Jim" was mean to him. During this period of time, RBL referred to defendant as "Daddy Jim." Upon his return from visitation with defendant, RBL would be lethargic, or he would bang his head, kick, spit, cry, punch, pull his hair or call JL a bitch or a whore. Defendant denied that JL ever spoke to him about RBL's problems, and defendant denied that RBL was ever reluctant to accompany defendant on visitation days.

In January 1988, JL took RBL to see his pediatrician, Dr. Khoka. By this time it was apparent that RBL was suffering from a case of venereal warts on his rectum, a condition commonly caused by sexual contact. On Dr. Khoka's advice, JL had RBL examined for learning

disabilities. Based on the results of this evaluation, JL spoke with a social worker who determined that RBL showed signs of having been physically abused.

On or around February 2, 1988, a Department of Children and Family Services (DCFS) worker, Mary Ellen Schaid, and Sergeant Wayne Fieroh of the Illinois State Police went to JL's home and spoke with RBL. JL was not present during this interview. During the interview, RBL indicated that he and defendant had "bad secrets." RBL refused to explain himself further.

On February 4, 1988, RBL was admitted to the child development program at Mercy Center in Aurora. During his stay, RBL was under the care of Marjorie Foreman, a psychiatrist. In treating RBL, Dr. Foreman relied upon the history provided by JL. JL explained that she had been concerned about RBL's welfare for about a year prior to his admission and that she consulted a lawyer during that year to see about discontinuing defendant's visitation rights.

At the outset of RBL's hospitalization, Foreman informed JL that the staff was not there to get information about the abuse and that it would be inappropriate to ask RBL specific questions about the abuse. Sometime during RBL's stay, Dr. Foreman had to ask JL to focus on therapeutic issues rather than on her attempts to prove what happened between RBL and defendant.

An examination performed by a medical doctor at Mercy revealed that RBL suffered from venereal warts and abnormally loose sphincter tone. RBL also had a scar resulting from a tear in the skin surrounding his rectum.

JL testified that after RBL was released from Mercy Center on March 21, 1988, he began seeing Tina Grossman, a therapist who specialized in treating and evaluating child sexual abuse. RBL's first session with Grossman was on March 27, 1988. After that, he saw her regularly for one-hour sessions, two times a week. Six months preceding the trial, Grossman changed the sessions to two-hour sessions, one time a week.

RBL testified at trial that he had seen Grossman hundreds of times. During his therapy, RBL stabbed a "Daddy Jim" doll with a play knife. RBL also stepped on the "Daddy Jim" doll and picked it up and threw it down with Grossman's help. RBL testified that he talked about what "Daddy Jim" did to him each time he went to Grossman's. RBL also had the opportunity to mark the "Daddy Jim" doll with imitation blood. In addition, it is apparent that RBL recreated the abusive acts using a "[RBL] doll" and a "Daddy Jim doll."

Sergeant Fieroh conducted further interviews with RBL on March 31, 1988. JL briefed Fieroh on RBL's behaviors up to that point in time. Fieroh's questions focused on these behaviors and on RBL's relationship with defendant.

In November 1988, RBL wrapped an electrical cord around his neck and jumped off his dresser. He said he just wanted to die. In February 1989, RBL was standing naked in the living room with his belt wrapped around his neck. His face was blue, and his tongue was hanging out. He said he had to die because he had told bad secrets. Thereafter, RBL was hospitalized for six weeks at Lutheran General Hospital and was released sometime in March 1989.

Defendant testified that he never talked to RBL about bad secrets, that he never threatened to hurt JL if RBL told bad secrets, that he never physically or sexually abused RBL, and that he (defendant) was never physically or sexually abused. Defendant was found guilty after a bench trial. He was given a 15-year sentence for having committed a Class X felony, for which a sentence of not less than six years or more than 30 years must be imposed. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3).

Defendant first contends that the trial court abused its discretion when it allowed five-year-old RBL to testify about events that occurred when he was three. Defendant argues that the court incorrectly looked to RBL's present ability to testify rather than his ability to perceive and testify at the date the events occurred.

The competency of a witness is a determination that lies within the discretion of the trial court and will be reversed only when there has been an abuse of that discretion or where there has been a manifest misapprehension of some legal principle. (*People v. Ballinger* (1967), 36 Ill. 2d 620, 622; *In re A.M.C.* (1986), 148 Ill. App. 3d 775, 778.) The well-established rule is that the degree of intelligence of a child is the factor which determines competency, not chronological age. (*Ballinger*, 36 Ill. 2d at 621-22; *A.M.C.*, 148 Ill. App. 3d at 778; *People v. Barfield* (1989), 187 Ill. App. 3d 257, 260; *People v. Epps* (1986), 143 Ill. App. 3d 636, 639; *People v. McNichols* (1986), 139 Ill. App. 3d 947, 951.) In order to determine a child's competence, a court should consider whether the child is sufficiently mature to (1) receive correct impressions from his senses; (2) recollect these impressions; (3) understand questions and narrate answers intelligently; and (4) appreciate the moral duty to tell the truth. *Ballinger*, 36 Ill. 2d at 622; *McNichols*, 139 Ill. App. 3d at 951.

When RBL testified at trial, he was five years old. In determining RBL's competence, the trial judge looked at RBL's present ability to

answer questions and to understand the nature of those questions. He also looked at RBL's past ability to receive impressions and his ability to recollect those impressions. In addition, the court noted that RBL knew his family members, was able to count to 24, could recite his ABC's, knew his colors, named his school, identified the judge and his function, and was aware of the difference between the truth and a lie.

Defendant argues that, regardless of RBL's present ability to testify, the court below should have required a showing that RBL could accurately perceive events at age three. For example, defendant states that RBL testified incorrectly with regard to the location and layout of defendant's house, the identity and relationship of defendant's brothers and sisters, and that RBL testified he was raped 11 times when he could not count that high at the time.

■ We determine that these errors of fact or memory are unrelated to RBL's consistent testimony that he was sexually abused at least once. "It is not necessary for the child to give perfect answers to questions during the competency determination or at trial for the child to be deemed a competent witness." (*Barfield*, 187 Ill. App. 3d at 261.) The witness' ability to remember is to be tested on cross-examination. The test of competency is measured by intelligence, not memory. Therefore, the trial court did not abuse its discretion in finding RBL competent to testify.

Defendant next contends that the court erred in excluding portions of expert testimony which would have shown that defendant's makeup was such that he was unlikely to have committed the acts of abuse.

At trial defendant called a clinical psychologist as an expert witness in order to testify that defendant did not exhibit the same traits as those typically exhibited by persons who sexually abuse children. The expert testified that there was nothing in her analysis which suggested that defendant was a pedophile. The expert then began to explain conditions under which someone who is *not* a pedophile might abuse a child and how she found no evidence of circumstances that would suggest abuse by defendant. Upon objection by the State, the court disallowed further testimony on this matter because it spoke to the ultimate issue of the case.

■ Defendant argues that he should be able to submit evidence of his personality if the victim is allowed to submit evidence of post-traumatic stress syndrome (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2). We do not agree. Section 115—7.2 simply gives the victim a method of showing that abuse has occurred. Such evidence does not necessarily indicate that defendant caused that abuse. In contrast, defendant's

expert in the present case proposed to testify that defendant did not commit the abuse. Thus, defendant's evidence speaks directly to the issue.

"While a defendant may introduce evidence to establish that his character traits are inconsistent with committing the crime with which he is charged, this must be shown only by evidence of general reputation and not by the personal opinion of the witness." (*People v. Wheeler* (1991), 216 Ill. App. 3d 609, 619.) In *Wheeler* the trial court prevented defendant from presenting the testimony of two psychologists that he did not possess traits consistent with those of a pedophile. (*Wheeler*, 216 Ill. App. 3d at 619.) The trial judge here was more liberal than the *Wheeler* court because defendant *was* able to introduce evidence that he did not possess traits consistent with a pedophile. Instead, defendant here was simply prohibited from introducing testimony that there was no evidence of other circumstances that would suggest he committed child abuse. In light of *Wheeler*, it is apparent that the exclusion below did not amount to an abuse of discretion.

Defendant next contends that the admission of out-of-court statements by RBL pursuant to section 115—10 violates the *ex post facto* clause where the offense charged preceded the effective date of the amendment. We disagree.

Section 115—10 provides a hearsay exception which allows a child to testify that an out-of-court statement was made in which he or she complained that an act of abuse took place. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.) In addition, section 115—10 provides that the child may testify as to the contents of that complaint. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) Under prior statutes, a child was permitted to testify that he/she complained of an abusive act to another, but no hearsay exception was provided as to the contents of that complaint. Ill. Rev. Stat. 1987, ch. 38, par. 115—10(a)(1).

Section 115—10 concerns trial procedures rather than substantive matters, and, therefore, the more recent version of the statute applies. *People v. Nicholl* (1991), 210 Ill. App. 3d 1001, 1010; *People v. Priola* (1990), 203 Ill. App. 3d 401, 417.

We agree with defendant's assertion that a law is *ex post facto* if it makes criminal an act that was not criminal at the time the act was committed, or if it increases the punishment for an offense previously committed, or if it alters the rule of evidence to make a conviction easier. (*Priola*, 203 Ill. App. 3d at 418.) However, the most recent version of section 115—10 requires a determination that safeguards exist which bolster the reliability of the statements. Therefore, its

provisions do not necessarily make conviction easier. *Priola*, 203 Ill. App. 3d at 418.

Defendant next contends that the court erred in admitting hearsay pursuant to section 115–10 because the evidence of the time, content, and circumstances of the statements failed to show sufficient safeguards of reliability. Defendant also argues that the content of some of the statements exceeded the scope of what is admissible under section 115–10.

Section 115–10 of the Code provides as follows:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12–13 through 12–16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.

(d) The proponent of the statement shall give the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115–10.

We begin by noting that cases which involve the determination of the reliability of section 115–10 statements are fact specific. Therefore, our holding in this matter will be considered *sui generis*.

■ The first series of statements defendant complains about are those which preceded RBL's hospitalization at Mercy Center. At trial JL testified that when it was time for RBL to accompany defendant on visitation days between September 1987 and January 1988, RBL would "make a scene" and say that he did not want to go to "Daddy Jim's" house and that "Daddy Jim" was "mean" to him. Defendant argues that these statements do not describe "detail[s] pertaining to any act which is an element of an offense" and, therefore, they do not fall within the purview of the hearsay exception provided by section 115–10(a)(2). The trial court admitted these statements for the fact that they may have been said and not for the truth of the matter asserted. To this extent, the statements are not hearsay. Therefore, section 115–10 would not apply.

■ Defendant also argues for the inadmissibility of testimony offered by Sergeant Fieroh. Sergeant Fieroh testified that on February 2, 1988, he and Schaid came to interview RBL in response to a report made by JL. Fieroh testified that Schaid initiated the interview and spoke with RBL about neutral topics with the intention of learning whether RBL understood different concepts. Schaid then gave RBL anatomically correct dolls with which he could play. RBL wanted to disrobe the dolls but hesitated and told Fieroh and Schaid that his mother said that it was not a nice thing to do. Schaid then told RBL that he could disrobe the dolls.

According to Fieroh, when asked about the male doll, RBL simply looked at the penis area and made a bellowing sound. RBL said he did not know what the penis was. Schaid asked if RBL did not know, or if it was a secret. RBL did not answer but looked startled. Schaid then asked if RBL had any secrets, and whether they were good secrets that made him happy or bad secrets that made him sad. RBL said that he had bad secrets. Schaid asked RBL who told him these secrets, and RBL responded, "Daddy Jim."

The trial court ruled that these statements were within the purview of section 115–10 because they were a form of identification of the defendant. We agree. The general rule is that statements which identify the defendant in a child abuse case are admissible as hearsay exceptions under section 115–10. *People v. Morton* (1989), 188 Ill. App. 3d 95, 103; *Priola*, 203 Ill. App. 3d at 418.

The second series of statements defendant objects to are those made during RBL's hospitalization at Mercy Center. At trial, JL testi-

fied that on February 4, 1988, she was with RBL in his room at the hospital. RBL asked who could come to see him. JL responded by asking RBL whom he wanted to see. After RBL named several relatives, JL asked him if he wanted to see his "Daddy Jim." When RBL said "no," JL asked him why. RBL replied, " 'Cause he's mean to me and everything." JL pressed RBL to explain what he meant by "and everything." Eventually RBL turned around and yelled, " 'Cause he pokes my hole." JL asked what hole, and RBL pointed to his buttocks. JL then immediately left the room to get a staff member to come listen to what RBL had to say. A nurse, Mary Beth Hutches, returned with JL. Hutches testified that when she asked RBL to repeat what he had told his mother, RBL climbed into his younger brother's playpen and began to talk like a baby. After a little while, RBL climbed out of the playpen, got on top of a desk, and lay in a fetal position. After JL asked RBL to tell Hutches what "Daddy Jim" does to him, RBL said, " 'Daddy Jim' pokes my hole." Hutches asked RBL if there was anything else. RBL shook his head "no." Hutches testified that RBL had a frightened look on his face and was quivering. At bedtime later that evening, when Hutches and RBL were alone, Hutches asked RBL what "Daddy Jim" does. RBL said "he pokes my hole." Hutches asked him what hole, and RBL pointed to his buttocks. At that point, RBL lay back in his bed and stared off into space.

Defendant alleges that the statements above do not qualify as section 115—10 hearsay exceptions because the surrounding circumstances do not provide adequate assurances of reliability.

In determining whether there were sufficient safeguards of reliability pursuant to section 115—10(b)(1), the trial judge made the following statements:

> "I think based upon what I've heard here in this case, and the condition of diagnosis back in the early part of February that the child has post-traumatic stress disorder, shows that the child was very fragile. And that it sounds naturally after listening to the doctor that he's not going to just blurt out everything that happened. There's going to have to be a little bit of questioning, a little bit of prying into ***.
>
> We have to use the word prompting, I'll use the word prompting. There has to be some prompting. Not all prompting is wrong. I think it's the degree of prompting that might create a situation where a safeguard for reliability might be overcome.
>
> The prompting that seemed to have taken place on February 1st or 2nd with Mary Ellen Schaid and Wayne Fieroh did

not seem to be excessive. The prompting that took place *** on February 20th when the mother first found out doesn't seem to be excessive.

Now, when Mary Beth Hutches, more or less [a] stranger to the family situation, to the family nucleus, was called in and the mother said now tell her, there was quite a bit of prompting there. But at that time the poke in the hole had already been mentioned. And it appears that she simply was—the mother simply now is trying to get her child to tell this stranger the story.

And it might take—it's logical that it would take a little bit more prompting *** because the child now is trying to tell it to a stranger rather than his mother who he felt safe with. But he did tell the story.

And Mary Beth Hutches, I think rightfully so, wanting to check it out herself, later on when the mother was gone, asked on her own, and she also got some admissions about the event."

The United States Supreme Court court has set forth guidelines which should be applied by a court making a reliability determination under a hearsay exception. (*Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139.) *Wright* held that absent a firmly rooted hearsay exception, a showing of particularized guarantees of trustworthiness must be made in order to satisfy the confrontation clause. (*Wright*, 497 U.S. at 815, 111 L. Ed. 2d at 652, 110 S. Ct. at 3146.) Although the present case does not involve a confrontation clause question, we find *Wright* instructive when making a reliability determination. The central issue in *Wright* was whether the State carried its burden of proving that a 2½-year-old victim's incriminating statements bore sufficient indicia of reliability in order to withstand scrutiny under the confrontation clause. (*Wright*, 497 U.S. at 815, 111 L. Ed. 2d at 653, 110 S. Ct. at 3147.) According to *Wright*, the relevant circumstances to be examined when determining reliability are those that surround the making of the statement and that render the declarant particularly worthy of belief. (*Wright*, 497 U.S. at 819, 111 L. Ed. 2d at 655, 110 S. Ct. at 3149.) The court cited spontaneity of repetition, consistency of repetition, and use of unexpected terminology as some of the factors which may be helpful in determining the reliability of incriminating statements. (*Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The court also stated that it is permissible to examine whether the child had a motive to fabricate when making a reliability determination. (*Wright*, 497 U.S. at 826,

111 L. Ed. 2d at 659, 110 S. Ct. at 3152.) In reaching its decision, the court in *Wright* focused on the improper method of interrogation used by a physician who examined the allegedly abused child. Specifically, the facts show that the physician asked the child questions which focused directly upon the defendant's involvement with the child. The court determined that the physician had preconceived notions that defendant committed the abuse and asked impermissibly suggestive questions. *Wright*, 497 U.S. at 826, 111 L. Ed. 2d at 659, 110 S. Ct. at 3152.

We note that it was the leading nature of the questions that rendered them deserving of being censored. However, the mere fact that the testimony was obtained as a result of questioning does not alone render it inadmissible. (*Morton*, 188 Ill. App. 3d at 104.) To hold otherwise would leave unprotected those children who do not come forth of their own volition to complain about the abuse.

■ In the present case, we determine that RBL's statements were made under circumstances which provided particularized guarantees of trustworthiness. Most importantly, RBL's initial statement that defendant abused him was made in response to a nonleading question. JL carefully worded her questions to RBL when asking him about whom he would like to come to the hospital. JL was neither suggestive nor leading in her questioning format. RBL freely stated that he did not want to see "Daddy Jim" because "he pokes my hole." Subsequent questioning by JL, hospital staff, and other medical personnel simply sought further details about the incident.

RBL was, indeed, subject to extensive questioning about the abuse. However, such questioning, in and of itself, should not render his testimony unreliable. The essence of RBL's story was always the same. RBL never equivocated or withdrew his statements. RBL had no motive to fabricate such an accusation, nor was such a description expected of a child of his age.

In light of the above, we determine that the trial court properly found RBL's statements to be reliable and thus admissible. We agree with the trial judge that the prompting used was a legitimate and necessary method to get RBL to talk about a very sensitive subject. We do not feel that the facts here indicate that improperly suggestive or leading questions were asked. In sum, RBL's freely given initial statements about his "Daddy Jim," coupled with his unwavering adherence to the essential facts of the story, provide sufficient guarantees of reliability to satisfy section 115—10.

A final series of statements defendant objects to are those made after RBL was discharged from Mercy Center. JL testified that on

March 28, RBL asked her if she wanted to play the "peeper game." JL said that she told RBL she did not want to play. However, she asked him to show her how it was done. RBL then touched his penis until it became erect. JL asked what would happen next, and RBL said that "Daddy Jim" would get the "sharp stuff." When JL asked what he meant, RBL said, "the fork." At JL's request, RBL went to the kitchen and came back with a fork. He touched his penis with the fork and said, "Then ['Daddy Jim'] pokes it in my hole."

Fieroh came to interview RBL on March 31, 1988. JL testified that she told Fieroh about the March 28 statements so he could question RBL about them. Fieroh said that he asked RBL where "Daddy Jim" lived. RBL told Fieroh that he did not like to go there. When Fieroh asked him why, RBL stated that "Daddy Jim" "poked his hole." Fieroh asked RBL to explain and RBL pointed to his buttocks and repeated "he pokes my hole." Fieroh asked what "Daddy Jim" used, and RBL said "a fork." At Fieroh's request, RBL got a fork from the kitchen and pointed to the prong end when asked which side "Daddy Jim" used.

Fieroh said he asked RBL if there was anything else he did not like about going to "Daddy Jim's." RBL said sometimes they played the "peeper game." In response to Fieroh's questions, RBL indicated that by "peeper" he meant "penis." RBL explained that " 'Daddy Jim' poked [RBL's] hole" with his "peeper" and that sometimes "white sticky stuff" came out. Fieroh asked if there was anything else. RBL said sometimes they played the "doctor game." In response to several more questions, RBL said "Daddy Jim" would have him kiss "Daddy Jim's" penis and that sometimes "sticky stuff" would come out. RBL also said that whenever they played the "peeper game" or the "doctor game," "Daddy Jim" would tell him these games were their secrets and RBL should not tell anyone or "Daddy Jim" would pull all of his mommy's hair out.

■■ Defendant now argues that the circumstances surrounding these statements preclude a finding of reliability. First, defendant asserts that the increasingly detailed accounts of the abuse tend to undercut their reliability. Second, defendant attacks the accuracy of the statements because they were made several months after any abuse could have occurred. Third, defendant questions whether the statements were voluntary because they were made after weeks of therapy conducted by the Mercy Center staff. It is apparent from the reliability hearing that the trial judge considered all the circumstances surrounding each of the statements made by RBL. With respect to the statements above which were made between March 28 and March 31,

the trial judge held that there had been sufficient safeguards of reliability in the areas of time, content and circumstances. We agree. We view the detail which RBL adds over time to be more of a reflection of RBL's ability to cope with and talk about the trauma, rather than an indication of a false story. In addition, we view the time lapse defendant complains about as insignificant. The facts indicate that the abuse could have occurred only three months earlier. Furthermore, RBL's therapy does not undercut his reliability in light of the fact that incriminating statements had already been made.

If section 115—10 is to have any meaningful effect, then it must be permissible to question children about the alleged abuse. We see nothing impermissibly suggestive or leading about the questions asked by Fieroh or JL. It is entirely unrealistic to expect a child to speak about such topics in the course of casual conversation. We recognize the leading nature of the questions that were used in *Wright*, and we determine that the questions asked here do not rise to the same level of suggestibility. (*Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139.) Defendant argues that the Mercy Center staff was told that "Daddy Jim" had sexually abused RBL and engaged in repeated playing out of the abuse between a " 'Daddy Jim' doll" and a "RBL doll." Again, in light of the fact that RBL had already labeled defendant as the abuser, we do not view this therapy as unduly manipulative.

█ Defendant next argues that the statements cited above should have been excluded to the extent that they included details which exceed the scope of section 115—10. Defendant asserts that the charge upon which the State proceeded to trial was that defendant committed an act of penile/anal penetration. Defendant asserts that he was not charged for having committed an offense which included oral/penile or sexual penetration with a fork. We do not agree.

Section 115—10 allows the court to admit statements describing "detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child." (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) In the present case, defendant was charged for having committed an aggravated criminal sexual assault under section 12—14(b)(1). (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1).) This section defines an aggravated criminal sexual assault as one where "the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1).) The fact which the State put forth in order to support its allegation that defendant committed

an aggravated sexual assault was that he committed an act of anal/penile penetration.

In *People v. Thomas* (1990), 137 Ill. 2d 500, an indictment specifically alleged that defendant knew a single victim was present when he set fire to a garage. The court held that this allegation satisfied the statutory requirement that the defendant knew or should have known that "one or more persons" were present in the structure. The court also held that it was not error for the trial court to admit evidence that defendant knew or should have known that other people besides the named victim were present and injured. The court reasoned that the identity of the persons injured was not a material element of the offense. Thus, evidence that the defendant should have known others were present was considered to be surplusage. The court noted that it would have been redundant for the State to allege that the defendant should have known that others were present when that fact was implicit in the language of the statute under which the defendant was charged. *Thomas*, 137 Ill. 2d at 522.

Applying this reasoning to the present case, we hold that the evidence admitted at trial that defendant committed oral/penile penetration and sexual penetration with a fork was consistent with the statute under which defendant was charged. Both of these acts are acts of sexual penetration. We determine that defendant had adequate notice that he was being charged for having committed an act of sexual penetration. Following the reasoning in *Thomas*, evidence adduced at trial that the defendant committed these other forms of penetration was surplusage in light of the facts contained in the information, alleging that defendant committed an act of aggravated sexual assault.

Defendant's remaining objections to the hearsay exceptions admitted below are equally unpersuasive. Because the statements were contextually and substantively similar to those already discussed, we see no reason to question their reliability at this time. We are convinced that the trial court carefully considered the reliability of RBL's various out-of-court statements, and we determine that the admission of this evidence should be affirmed.

Defendant's final argument is that the trial court abused its discretion in sentencing defendant because the court improperly relied upon RBL's age as an aggravating factor. We agree.

The general rule is that a factor necessarily implicit in a crime should not be used as an aggravating factor when sentencing for that crime. (*People v. Conover* (1981), 84 Ill. 2d 400, 404.) To illustrate, in *People v. White* (1986), 114 Ill. 2d 61, 66, the court held that the victim's age should not be considered as an aggravating factor in sen-

tencing for a crime where the youth of the victim was an element of the offense of aggravated battery of a child.

■■ In the present case, the trial judge asserted that RBL was under 12 years of age and that this fact was a basis to increase defendant's sentence. We hold that it was error for the trial judge to make such a determination because the age of the victim is an inherent element of the crime of aggravated criminal sexual assault. Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1).

We must now determine whether remand for sentencing is required. A case must be remanded for resentencing when the reviewing court is unable to determine the weight given to an improperly considered factor. *People v. Bourke* (1983), 96 Ill. 2d 327, 332.

In *White*, the court considered the emphasis placed on the improper sentencing factor to be insignificant because the trial court placed *primary* importance on the need to deter. (*White*, 114 Ill. 2d at 67.) In *Bourke*, the court examined the length of the sentence imposed when it considered the weight placed upon the improperly considered factor. *Bourke*, 96 Ill. 2d at 333.

Here, the trial judge made no indication that it placed primary importance on any single factor. Thus, we are unable to determine the weight given to the improperly considered factor, *i.e.*, the child's age. Furthermore, the 15-year sentence imposed was substantially above the six-year minimum. Thus, we cannot say that the weight placed on the improperly considered aggravating factor was so insignificant that it did not result in a greater sentence. (*Bourke*, 96 Ill. 2d at 333.) Accordingly, the sentence must be vacated and the cause remanded for resentencing. This holding should not be construed as a commentary upon what the sentence should be; it simply asserts error due to improper reliance upon an aggravating factor that should not have been considered in the context of sentencing. In all other respects, the judgment is affirmed.

The judgment of the circuit court of Kane County is affirmed in part and vacated in part, and the cause is remanded for resentencing.

Affirmed in part; vacated in part and remanded.

GEIGER and DUNN, JJ., concur.