THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TROY MORGAN, Defendant-Appellant.

First District (2nd Division)   No. 1—91—1226

Opinion filed March 16, 1994.—Rehearing denied April 13, 1994.

Michael J. Pelletier and Craig Jago Beauchamp, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Clare M. Wesolik, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McCORMICK delivered the opinion of the court:

A jury found defendant, Troy Morgan, guilty of aggravated criminal sexual assault. The trial court ordered defendant to pay $1,800 restitution and sentenced him to $9\frac{1}{2}$ years in the Department of Corrections. Defendant contends that prosecutorial misconduct deprived him of a fair trial, he did not receive effective assistance of counsel, and the trial court erred by admitting hearsay testimony, answering a jury question and ordering restitution. We find that any errors had no prejudicial effect, so we affirm.

Defendant met B.J. in February 1987. B.J. was then living with her husband, Mr. J., and their three-year-old son, R.J. B.J. also had a daughter, Celise, from a previous marriage, who sometimes stayed with B.J. B.J. and R.J. moved out of the home in March 1987 and B.J. began dating defendant. Celise, who was then 12, stayed with B.J. and R.J. from May until August 1987. Shortly after R.J. turned four, in June 1987, B.J. had lung surgery which kept her hospitalized for two weeks. Although R.J. visited his father before and after B.J.'s hospitalization, he did not see his father for about five weeks through B.J.'s hospitalization and recuperation.

Mr. J. filed a petition for divorce from B.J. in November 1987. After R.J. came to visit his father on December 15, 1987, Mr. J. decided to seek custody of R.J. Mr. J. met Lynette Donerson, who needed a place to live, so he invited her to move into his home and help him take care of R.J. She moved in during January 1988. B.J. did not contest custody, so R.J. moved in with his father in February 1988, when the divorce became final. R.J. continued to stay over at his mother's home periodically.

Defendant moved in with B.J. in early March and married her on March 19, 1988. In late April 1988, R.J., Mr. J. and Donerson went to visit Mr. J.'s brother Paul and his wife and son. The next day Paul called Mr. J. to discuss R.J.'s behavior. Mr. J. told Donerson about the conversation, and Donerson had a discussion with R.J. concerning sexual behavior.

On May 3, 1988, Donerson took R.J. to a nearby hospital where

Dr. Orwen Mason examined him for signs of sexual abuse. Donerson then took R.J. to the local police station. The detective told her to set up an appointment for an evaluation at Mt. Sinai Hospital. Dr. Stanley Luke and Dr. Sharon Ahart examined R.J. on May 17, 1988, and concluded that he had been sexually abused. Police came to B.J.'s home that day and asked defendant to come to the station soon. When he arrived at the station the next day, police arrested him.

Prior to trial the State argued that statements R.J. made to Mr. J., Donerson, Dr. Luke, Dr. Ahart and the detective were admissible under section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—10). The prosecutor described the testimony he expected to educe. Defendant's attorney disagreed with the prosecutor's description of the expected testimony, and he objected to the testimony he anticipated from all witnesses except Mr. J. Based solely on the conflicting statements of counsel, and without hearing any evidence, the trial court decided that the witnesses apart from the detective could testify to statements R.J. made to them. The court found statements to Dr. Luke and Dr. Ahart admissible under section 115—13 (Ill. Rev. Stat. 1991, ch. 38, par. 115—13), because those doctors were treating physicians.

The trial court determined that R.J., who was seven at the time of trial, was competent to testify. Although R.J. remembered going to the hospital when he was four, he did not remember why he went. When his mother went into the hospital he lived with defendant and Celise. He did not remember being touched in a way he did not like. He started to answer questions about something that happened to him while B.J. was in the hospital, saying that it happened at night in the living room, but he could not say what had happened. He said he knew what the prosecutor was talking about, someone did something to him, but he would not answer more specifically.

After a recess R.J. answered that he remembered telling the prosecutor what had happened, and he remembered using dolls to show him. R.J. agreed that he had used a boy doll and a man doll to describe the incident. The prosecutor handed R.J. those dolls on the witness stand. R.J. said the boy doll was him, and he showed the man doll putting its penis in the boy doll's mouth and anus. When the incident he described happened, only R.J., Celise and defendant were in the home. No other man was present.

The prosecutor asked who did this to him. R.J. did not answer. The prosecutor asked if R.J. could point out the man who did this to him. R.J. said no, but he agreed that if the prosecutor pointed to him he could say yes. The prosecutor pointed to every male in the courtroom, and after pointing to each he asked R.J. whether that

man did that to him. R.J. said no to each male until the prosecutor pointed to defendant, and then R.J. said yes. The prosecutor asked if anyone else did that type of thing to him. R.J. said yes, a woman he had seen once in a restaurant did.

On cross-examination R.J. said that his mother had also done something similar to him, on the day she came home from the hospital. With dolls he showed that his mother undressed and laid on top of him, then took his penis in her mouth. Celise also laid on top of him. Defense counsel asked what the woman in the restaurant had done, and R.J. said she asked if he wanted something to eat. Counsel asked if that was the woman who did something bad to him and R.J. said, "[no], that was mom." He was not sure whether he lived at his grandmother's house while his mother was in the hospital.

Mr. J. testified that when R.J. visited him on December 15, 1987, while they were watching television, R.J. began moving his buttocks up and down and from side to side. Mr. J. asked what he was doing and R.J. said, "[T]his is the way that Troy and momma got the pussy." R.J. then got up on his hands and feet, with his buttocks up in the air. His father asked what he was doing, and R.J. said that was how defendant made him stand when he "put his pee-pee in [R.J.'s] bubu." Mr. J. asked why he was telling him this, and R.J. said, "Daddy, I don't like that ***. I just thought I would tell you."

Mr. J. thought that R.J. might have seen defendant having sex with B.J. and then imagined things, possibly because of the divorce. Mr. J. did not report the incident to the police or take R.J. to the hospital.

Mr. J. testified that after he and Donerson took R.J. to visit Paul J.'s family in April 1988, Paul called to tell him that Paul's son said R.J. asked to suck his cousin's penis. Paul said, "I don't know what they did to this kid over there. *** You better get him some help." Defense counsel did not object to the testimony.

Donerson testified that R.J. engaged in inappropriate sexual behavior before the incident with his cousin in April 1988. Mr. J. told Donerson what Paul had told him about the incident, and Mr. J. asked Donerson to talk with R.J. about this behavior. The prosecutor asked Donerson what Mr. J. said Paul told him. The court overruled defendant's objection to the question, noting that the substance of the conversation was in evidence from Mr. J.'s testimony, and then directing the jury "not [to] consider it for the truth of the matter asserted. But the jury may consider it only insofar as it went to this witness' state of mind and as a reason for asking the questions she might have asked ***[,] as an explanation of the content and the reason for the conversation."

Donerson testified that she told R.J. he should not let anybody touch certain areas of his body. She asked if anyone had done so. R.J. said no. She asked if he wanted to touch someone like that, and he again said no. She told him his cousin told them what R.J. had done the day before. She again asked, "[A]re you sure *** no one has done that to you before?" He said, "Troy." Donerson asked what defendant did. R.J. said, "He put his pee-pee in my butt." In response to further questions, R.J. added that defendant "put his pee-pee in [R.J.'s] mouth" and "Cel[ise] did the pussy" to R.J. by making him lick her vagina. He said both incidents happened while B.J. was in the hospital.

Dr. Mason testified that he was working at the hospital as part of his residency in family practice when he examined R.J. on May 3, 1988. He had examined about 10 other patients for signs of sexual abuse in the course of his training for family practice. He found no fissures, scars, abrasions, peeling or bruises near R.J.'s anus, and he found the rectal muscle tone normal. On his report he wrote that the tone was moderate, which to him meant the same as normal or average. Since Donerson brought R.J. to the clinic based on her suspicion of sexual abuse, Dr. Mason wrote "alleged sexual abuse" on the report as the diagnosis, and he informed the Department of Children and Family Services (DCFS) of the allegations, even though he found nothing in his examination to support the allegations. He agreed that a psychiatric evaluation would be useful for determining whether R.J. suffered sexual abuse. He did not discuss the allegations with R.J.

Dr. Ahart, a pediatrician working at Mt. Sinai Hospital, testified that she examined R.J. on May 17, 1988. In her work at the pediatric ecology unit she has evaluated thousands of children for various kinds of abuse, including sexual abuse. She found some skin in R.J.'s anal region peeling, and she found both a small bruise and a small scar. The scar had to be the result of an injury which occurred more than 14 days before the examination, but the bruise and the peeling could have had more recent causes. R.J.'s rectal tone was moderately relaxed, which is a somewhat abnormal finding. The bruise indicated an external cause, so it could not be a result of the constipation R.J. had suffered periodically since he was six months old. The physical findings were consistent with sexual abuse as well as other possible causes.

The personnel at the pediatric ecology unit worked together to evaluate and treat patients for sexual abuse, using psychological as well as physical examination as a basis for their opinions. Dr. Ahart in the course of her physical exam asked R.J. if anyone had touched

his buttocks, or his "booty" as R.J. called it. R.J. said yes. She asked who and R.J. answered, "Troy." She asked what he had touched it with and R.J. answered, "his pee-pee." In response to further questions R.J. said defendant also put his penis in R.J.'s mouth. R.J. named no one other than defendant as responsible for improperly touching R.J. Dr. Ahart described R.J. as anxious and uncomfortable during the discussion. She concluded, to a reasonable degree of medical certainty, that R.J. was a victim of sexual abuse.

Dr. Luke, a clinical psychologist in the pediatric ecology unit at Mt. Sinai Hospital, testified that he evaluated R.J. on May 17, 1988. He had evaluated perhaps 200 children for various forms of abuse and neglect. He allowed R.J. to play with toys while they talked. R.J. began to gyrate in a manner Dr. Luke considered sexual, but Dr. Luke did not ask about the movements. Later he asked R.J. if he had been hurt. R.J. became anxious, but he answered, "Troy stuck his pee-pee in my butt, it hurt." Because of R.J.'s anxiety, Dr. Luke stopped questioning on that issue. In Dr. Luke's opinion, R.J. "was sexually abused by a perpetrator that he named Troy." The trial court sustained defendant's objection to the part of the response after the finding of sexual abuse.

B.J. testified that when she went into the hospital for lung surgery Celise and R.J. stayed with B.J.'s mother. She took her children back to her home immediately following the surgery, although she had 54 stitches and remained heavily bandaged for weeks. R.J. began attending nursery school in December 1987, shortly before the visit in which his father first noticed his odd behavior. R.J. never saw B.J. engage in sex. Defendant never stayed overnight at her home before March 1988, when he moved in shortly before their wedding.

B.J. first heard about the alleged sexual abuse in March 1988, when she went to pick up R.J. from his father's home. Donerson asked R.J. to tell B.J. what he told her. R.J. said, "Troy put his pee-pee in my booty." B.J. did not believe R.J. She heard nothing more about the allegations until early May 1988.

Defendant also testified that R.J. and Celise stayed with B.J.'s mother while B.J. was in the hospital. Defendant never stayed overnight with B.J. before March 1988, when he moved into her home. R.J. never saw them engage in sex, and defendant never had sexual contact with R.J. Defendant had a good relationship with R.J.

In closing the prosecutor argued:

"Up until a certain point, [R.J.] was able to go along and relay what had happened. *** You were all here, you all were able to see his eyes and his behavior from the witness stand, a few feet away, and the way he looked right over there. He wouldn't point at him, but I will. I'm not afraid. I can point to him.

\* \* \*

\*\*\* [R.J.] would look back once in awhile right over there. There is a look of terror."

The trial court overruled defendant's objection. The prosecutor continued:

"That little boy was terrorized. \*\*\*

\*\*\* He's too terrorized to point to him and tell us his name."

The prosecutor summarized how Mr. J. came to report the abuse, although at first he did not believe R.J.

"[T]here is another incident where things start to add up a little bit now. \*\*\* [Mr. J.'s] brother calls him and says, hey, your kid just propositioned my kid, put something, peepee in his mouth is wrong. One and one, now we got 2. \*\*\* So he talks to Lynette. \*\*\*

Lynette finds out something every parent does not want to hear is happening to their kid. \*\*\*
\*\*\*

So, they take the next step at that time. \*\*\* [T]hey see Dr. Mason. \*\*\*
\*\*\*

But \*\*\* Dr. Mason did admit \*\*\* the rectal tone was moderate tone. He testified, oh, it was average. If it was average or nothing was wrong, believe me his report would have said, normal. \*\*\*

\*\*\* Tells us his diagnos[i]s, alleged sexual abuse. \*\*\* I would tell you that if he didn't find anything, he certainly could have put inconclusive, no findings \*\*\*. \*\*\*

\* \* \*

He might have testified a little different than his report, but \*\*\* he did the right thing, called [DCFS] and called the police. \*\*\*
\*\*\*

And you have to ask yourself a question. The key to the whole case is, do you believe the doctor, [d]o you believe the kid? \*\*\*
\*\*\*

[Defendant] wants you to believe, yeah, I'm \*\*\* seeing her. But God, I never spent a night with her and never had sex with her. This is never during the weekends, never with the kids along, over a period of a year and something. That is for you to believe. If you believe that, he can sit there and smirk and whatever, but if you believe that, that—

[Defense counsel]: I'm going to object to that.

THE COURT: Smirking remark will be stricken.

\* \* \*

[Prosecutor:] But we have Doctor Ahart. We also have a psychologist, Doctor Luke. Does he have anything to gain by coming in here? And you have to ask yourselves, is there a conspiracy with Doctor Luke and Doctor Ahart and a 4 year old?

\* \* \*

*** [Did t]his 4 year old *** ha[ve] the knowledge and ability to make this up?

I sat home yesterday thinking to myself for once, you know, how many 4 year olds know the kinds of things this kid knew. I thought to myself, when I was 4 years old, I certainly had no idea about things like putting someone's penis in your butt, your anus and putting somebody's mouth. I had no idea in the world what those things were. This kid is a preschool kid, coming in here and telling us.

I asked myself, how could a kid learn things like that? I guess, if you sat him down in [ ] front of a t.v. and put one of those videotapes in there, he saw that enough, he would be able to come up with a story. And put a hustler stag in and come up with a story.

***

[Defendant] terrorized that little boy to the point that the little boy still sees a psychiatrist and a counselor."

After defendant's closing argument, which emphasized the incredibility of R.J.'s testimony, and therefore the incredibility of all the stories R.J. told outside of court, the prosecutor attacked defendant's credibility:

"We question—we ask you to question the believability of this man's saying, he never had sexual relationships with the woman for the entire year. Is that—we submit that that's not in the over-all picture of things, a believable statement. I'm not talking about morals. What adults do between themselves, fine.

And counsel suggests well, maybe she's the type of mother that doesn't want to have her child exposed to sexual behavior. These people couldn't find a hotel room, she couldn't leave them with her mom? They were chaste for a year because she didn't want her child exposed to this?

Now, let's remember, I do not mean to be casting aspersion on her and saying, she is an immoral woman, but I mean, she is the woman that had [R.J.] out of wedlock, and she didn't marry [Mr. J.] until a year later.

[Defense counsel]: I object to that.

THE COURT: He may argue.

[Prosecutor]: So, I mean, let's not put her up too high on a pedestal. This is the lady that by her own admission, living with her husband, starts dating the defendant.

[Defense counsel]: Your Honor, I'm going to object.

THE COURT: Sustained, sustained.

The jury will disregard that. Let's stick to the issue.

[Prosecutor]: What I'm talking about is, if her moral quality is

not the thing, as far as that goes, we submit that it is just not plausible that this woman and this man didn't have sex for a whole year. And it is just one more statement on her part and his part to try and get away from what really happened."

After 2½ hours of deliberations the jury sent the judge a note saying that the jurors could not agree on a verdict, and the tally was eight guilty, four not guilty. The judge told the lawyers that the tally was eight to four, but he did not tell them which verdicts each number supported. Without objection, the judge sent the jurors a note telling them to continue deliberations. One and one-half hours later, the jury returned a verdict of guilty.

At the sentencing hearing on March 11, 1991, Mr. J. testified that R.J. had continuing psychological counseling, for which Mr. J. had paid approximately $3,000. He showed the court a bill for $1,600 from a pediatrics center for testing and a bill for $650 from an individual, but he did not specify the purpose of that expense.

The trial court sentenced defendant to 9½ years in the Department of Corrections and ordered him to pay $1,800 in restitution, but stayed execution of the restitution. The court asked the prosecutor to provide documentation for the expenses prior to execution of the judgment for restitution. Although the prosecutor never provided the documentation, on March 21, 1991, the trial court entered an order for $1,800 restitution, without making the order contingent upon the previously ordered documentation.

Defendant contends that the trial court should not have admitted hearsay testimony from Donerson, Dr. Ahart, Dr. Luke and Mr. J. Defendant admits that his attorney failed to raise this issue in the post-trial motion, and he failed to challenge the admissibility of Mr. J.'s testimony prior to trial, but he asks this court to review the issue as plain error and because counsel's failure to preserve the issue is one of several examples of his failure to give effective assistance.

The trial court heard conflicting accounts from counsel concerning the anticipated testimony regarding statements R.J. made out of court. The court failed to consider any evidence before deciding that the hearsay testimony was admissible under section 115—10 of the Code. The section establishes that hearsay testimony like that admitted in this case is inadmissible unless "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(1).

The statute requires the court to make factual findings regarding the reliability of the statements made out of court. (*People v. West*

(1994), 158 Ill. 2d 155, 163-64.) In this case, since the trial court heard no evidence, it could make no such findings. Of course, the parties may proceed on stipulated evidence, and the court may draw conclusions about the reliability of out-of-court statements based on the stipulations. The parties here made no such stipulations, and the attorneys actively disagreed about what the evidence would show. The discussion between counsel and the trial court was not a "hearing" within the meaning of the statute. The court had no evidentiary basis at all for its conclusion that the statements were sufficiently reliable. Therefore we owe no deference at all to this conclusion, and there are no findings of fact to which we must defer.

Defendant had a statutory right to a determination of the reliability of R.J.'s out-of-court statements based on evidence not presented to the jury. We can see no strategic reason for forfeiting the right to test the State's evidence, especially in light of differences between counsel on the nature of that evidence. Nor can we see any tactical basis for the decision not to raise this or any of defendant's other issues on appeal in the post-trial motion. Defendant has shown that his counsel's representation fell below an objective standard of reasonableness.

Before we will reverse a conviction due to ineffective assistance of counsel, the defendant must show both that counsel's conduct fell below an objective standard of reasonableness, and that but for the deficient representation, there is a reasonable probability that defendant would have achieved a more favorable result. (*People v. Sommerville* (1990), 193 Ill. App. 3d 161, 171, 549 N.E.2d 1315.) If the court held an evidentiary hearing as required by section 115—10(b), we presume the witnesses would have testified as they did at trial. Hearsay statements are admissible under this section only if the time, content and circumstances of the statements provide sufficient safeguards of reliability. Illinois courts have found relevant such factors as spontaneity of the statements, consistent repetition, mental state of the declarant, use of unexpected terminology, and lack of a motive to fabricate. *People v. Coleman* (1990), 205 Ill. App. 3d 567, 581, 584, 563 N.E.2d 1010.

■ Here, Mr. J. saw R.J. stand on his hands and feet with his buttocks in the air. He asked what R.J. was doing, and R.J. told him that was how defendant made him stand when he "put his pee-pee in [R.J.'s] bubu." The statement was not entirely spontaneous, as R.J. was responding to his father's question. The act which led to the question was spontaneous, and the question was neither suggestive nor leading, so this factor does not count against admissibility. (See *People v. Edwards* (1992), 224 Ill. App. 3d 1017, 1029-31, 586 N.E.2d

1326.) R.J. later made similar statements to his mother, his doctors and Donerson. R.J.'s parents were in divorce proceedings at the time, and Mr. J. thought that the proceedings may have upset R.J. and led him to imagine things. Thus, the mental state of the declarant is a factor opposing admissibility. However, the description of the act is certainly not one expected from a four-year-old child who has not at least seen such an act. The context does not show any motive R.J. would have to fabricate the story he told. On balance we find that the consistent repetition, the unexpected description and the lack of a motive to fabricate give the statements R.J. made to his father sufficient safeguards of reliability, so even if counsel had properly insisted on an evidentiary hearing, these statements would have come into evidence.

■ Donerson testified that she made sure R.J. understood good touching and bad touching, and she asked if anyone had touched him in a bad way. He said no. She asked if he wanted to touch anyone that way. Again he said no. He changed his story only when Donerson confronted him, in an accusatory manner, about what he said to his cousin. The questions which produced the statements he made to Donerson about defendant were both very suggestive and leading, and because of the implicit accusation, R.J. had a motive to fabricate. The statements R.J. made to Donerson about defendant lacked sufficient indicia of reliability, so if the trial court had held the required evidentiary hearing it should have barred Donerson from repeating R.J.'s responses to her questions.

Relying on section 115—13 of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 115—13), the trial court allowed both Dr. Ahart and Dr. Luke to report the statements R.J. made to them in separate interviews. Under this section statements made to medical personnel "for purposes of medical diagnosis or treatment *** insofar as reasonably pertinent to diagnosis or treatment shall be admitted." Ill. Rev. Stat. 1991, ch. 38, par. 115—13.

■ R.J.'s identification of defendant as the person who sexually abused him was reasonably pertinent to diagnosis and treatment. Because of "special problems associated with intrafamily sexual abuse[,] *** the identity of the abuser is often an important element in diagnosing or treating the victim." (*State v. Vosika* (1987), 83 Or. App. 298, 304, 731 P.2d 449, 452.) In *United States v. Renville* (8th Cir. 1985), 779 F.2d 430, an 11-year-old child told a doctor in an examination that her stepfather abused her. The court acknowledged that under Federal Rule 803(4), which is substantially similar to section 115—13, the identity of the person responsible for injuries would rarely be reasonably pertinent to treatment or diagnosis.

"[T]he patient has no sincere desire to frankly account for fault because it is generally irrelevant to an anticipated course of treatment. Additionally, physicians rarely have any reason to rely on statements of identity in treating or diagnosing a patient. These statements are simply irrelevant in the calculus in devising a program of effective treatment.

*** We believe that a statement by a child abuse victim that the abuser is a member of the victim's immediate household presents a sufficiently different case from that envisaged by the drafters of rule 803(4) that it should not fall under the general rule. Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment.

Statements of this kind *** are reasonably relied on by a physician in treatment or diagnosis. *** [C]hild abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime. [Citations.] The exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser." (Emphasis in original.) *Renville*, 779 F.2d at 436-37.

Other jurisdictions have similarly concluded that when a child tells a medical professional he has been abused by a family member, the identity of the abuser is relevant to treatment and diagnosis. (See *Vosika*, 83 Or. App. at 304, 308, 731 P.2d at 452, 455 (and cases cited therein).) We agree. Since R.J.'s identification of defendant as his abuser was pertinent to treatment, and Dr. Ahart and Dr. Luke relied on his statements in treating him, his statements identifying his step-father as his abuser were properly admitted under section 115—13. We note that section 115—13 does not require a pretrial hearing for determining the admissibility of hearsay testimony. Therefore, we conclude that if the court had held the proper hearing prior to admitting all hearsay testimony regarding R.J.'s out-of-court statements, it would have excluded only Donerson's testimony.

■ We find no reasonable probability that defendant would have achieved a better result if Donerson's testimony were excluded. Along with R.J.'s testimony, the jury would have heard the testimony of Mr. J. and the doctors, who said R.J. identified defendant as his abuser. The trial court instructed the jury to evaluate R.J.'s out-of-court statements in light of his "age and maturity ***, the nature of the statements, and the circumstances under which the statements[ ] were made." The jury heard in Donerson's testimony that he made the responses to her in circumstances where he may well have had a motive to lie. Therefore, the jury probably relied least on Donerson's

testimony about statements R.J. made to her. If the jury relied on R.J.'s out-of-court statements at all, in all probability it relied on the statements to Mr. J. and the doctors, and those statements were properly admitted into evidence. Since defendant has not shown a reasonable probability that he would not have been convicted but for counsel's failure to protect defendant's right to an evidentiary hearing prior to admission of the hearsay testimony, he has not established that this failure is grounds for reversal for ineffective assistance of counsel.

Neither is the lack of a hearing grounds for reversal as plain error. When the error is not of constitutional dimension, error in the admission of evidence is grounds for reversal only if the evidence has substantial prejudicial effect. (Compare *People v. Triplett* (1985), 108 Ill. 2d 463, 486, 485 N.E.2d 9, with *People v. Foley* (1990), 206 Ill. App. 3d 709, 716-17, 565 N.E.2d 39.) In view of the other, more persuasive testimony concerning R.J.'s out-of-court statements, we find that the erroneous admission of Donerson's testimony had no substantial prejudicial effect.

Defendant next contends that his counsel ineptly failed to object to Mr. J.'s testimony as to what Paul told him, and counsel failed to raise in the post-trial motion the objections to Mr. J. and Donerson testifying to this conversation. Mr. J. testified that Paul told him R.J. had asked Paul's son if he could suck his penis. Mr. J. said he told Donerson about the conversation and asked her to speak to R.J. Donerson corroborated Mr. J.'s testimony that he told her about the conversation with Paul and because of that she spoke to R.J. The State argues that this testimony was admissible to show the basis for Donerson's conversation with R.J. (See *People v. Jones* (1986), 140 Ill. App. 3d 660, 673, 488 N.E.2d 1363.) Since Donerson's conversation with R.J. was inadmissible hearsay, it cannot justify introduction of other hearsay.

■ However, the conversation between Paul and Mr. J. shows only that R.J. engaged in sexual behavior inappropriate for a four-year-old, and this evidence helped establish that R.J. had been abused. The conversation in no way implicated defendant as the abuser. Mr. J. testified that Paul also said, "I don't know what they did to this kid over there," but no evidence connected defendant to "they" to whom Paul referred. Without the conversation between Paul and Mr. J., the evidence of R.J.'s inappropriately sexual behavior, from Mr. J., Donerson and the doctors, was overwhelming. The trial court further guarded against possible prejudice by explaining to the jury that the conversation between Mr. J. and Paul was admitted only to show why Donerson asked R.J. the questions

she asked. We find that the admission into evidence of testimony detailing the conversation between Paul and Mr. J. had no prejudicial effect, and therefore it is not grounds for reversal.

Defendant next argues that the prosecutor's closing argument deprived him of a fair trial. Again defense counsel failed to raise the issue in his post-trial motion, so we consider this issue only as plain error and insofar as counsel's failure provides further grounds for finding ineffective assistance.

The prosecutor argued that R.J. on the witness stand was "too terrorized to point to" defendant. He repeated this observation throughout closing argument. The prosecutor prefaced the remark by saying: "You were all here, you all were able to see his eyes and his behavior from the witness stand, a few feet away, and the way he looked right over there."

■ Demeanor of witnesses is a proper subject for closing argument. (*People v. Shelton* (1985), 140 Ill. App. 3d 886, 895, 489 N.E.2d 879.) The prosecutor based his argument that defendant "terrorized" R.J. on R.J.'s demeanor on the stand. The prosecutor's comments on R.J.'s demeanor did not exceed the bounds of permissible argument.

The prosecutor also told the jury that when he was four years old, he had "no idea about things like putting someone's penis in your butt." Mr. J. and the doctors testified that when R.J. was four, he said that defendant stuck his penis in R.J.'s anus. The trial court instructed the jury to evaluate the credibility of this statement, and one factor the jury could consider in making this determination is whether the statement was the kind one would expect from a four-year-old who had not been abused. (See *Coleman*, 205 Ill. App. 3d at 581.) The prosecutor's comment emphasized that R.J.'s out-of-court statements were credible because of the unexpected description, which was the kind of description one would not usually expect from a four-year-old child. This is within the wide range of permissible comment on the age and maturity of R.J. and the credibility of the out-of-court statements. The argument did not amount to an attempt to get the prosecutor's unsworn testimony before the jury. *Cf. People v. Hayes* (1989), 183 Ill. App. 3d 752, 539 N.E.2d 355.

The prosecutor also said that the case came down to the credibility of Dr. Mason against the credibility of R.J., and he said "you have to ask yourselves, is there a conspiracy with Doctor Luke and Doctor Ahart and a 4 year old?" Credibility is a proper subject for comment in closing argument. (*People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612.) The remarks, read in context, are comments on the State's witnesses' lack of motivation to lie. This is a factor the jury may take into account in assessing credibility. The

remarks did not improperly shift the burden of proof to defendant. We cannot say that the remarks exceeded the wide range of permissible comment. See *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970.

The evidence at trial supported the prosecutor's assertion that Dr. Mason could legally have put down "no findings," but instead he wrote "alleged sexual abuse" as his diagnosis. The prosecutor correctly recalled that Dr. Mason testified that he diagnosed "alleged sexual abuse" whenever a patient came to him based on such allegations, regardless of whether any physical findings support the diagnosis. The prosecutor correctly observed that by calling DCFS and the police, Dr. Mason did everything he should in a confirmed case of sexual abuse.

The prosecutor argued that if nothing was wrong with R.J.'s rectal muscle tone, Dr. Mason would have written "normal," not "moderate." The argument is directly contrary to Dr. Mason's testimony that to him the two words had the same meaning. Dr. Ahart found, and wrote, "moderately relaxed rectal tone," and she said that that was a somewhat abnormal finding. She did not say that any doctor who wrote "moderate" tone would mean somewhat abnormal tone, and she did not testify to any standard meaning in medical reports for the term "moderate." The prosecutor's argument on this point distorted the testimony.

The prosecutor more seriously distorted the evidence with argument that defendant's and B.J.'s testimony was incredible because they said that they never had sex while they were dating. Neither attorney asked whether they had sex during that year. Both defendant and B.J. testified that they never had sex in R.J.'s presence and that defendant never spent the night at B.J.'s home, but that testimony does not support the prosecutor's assertion that they said they never had sex.

In the course of the unsupported assertions on credibility, counsel cast aspersions on the moral character of defendant and B.J., saying: "she is the woman that had [R.J.] out of wedlock, and she didn't marry [Mr. J.] until a year later," and therefore the jury should "not put her up too high on a pedestal. This is the lady that by her own admission, living with her husband, starts dating the defendant." After the trial court sustained defendant's objection to this remark, the prosecutor reiterated that "it is just not plausible that this woman and this man didn't have sex for a whole year." Since neither B.J. nor defendant said that they did not have sex, this argument is an improper distortion of the credibility of the testimony.

We agree with defendant that this part of the prosecutor's

argument, and the distortion of Dr. Mason's testimony, fell outside the range of permissible comment. (See *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 403, 568 N.E.2d 783.) However, we find that the misstatements were not so egregious as to have deprived defendant of a fair trial, and therefore we find that they do not amount to plain error. We also hold that defendant has not shown a reasonable probability that he would have achieved a better result but for counsel's failure to preserve objection to the improper argument. Therefore, for the limited review applicable here, we find that the improper remarks do not provide grounds for reversal.

Defendant next contends that the trial court committed reversible error by telling the jury to continue deliberations after receiving a note telling the court that the jury was split eight to four, with the majority favoring a finding of guilt.

> "It is normally error for a trial court to inquire into the numerical division of the jury. [Citation.] However, where, as here, the trial court receives an unsolicited statement regarding the numerical division of the jurors, it is not error to order the jury to continue its deliberations." *People v. Iozzo* (1990), 195 Ill. App. 3d 1078, 1086, 552 N.E.2d 1308.

■ The court here properly told counsel the permissible information in the jury note, and counsel agreed to the court's response. The court's decision to withhold from counsel the fact that the majority of the jury favored guilt, information which neither the court nor counsel could properly ask from the jury, does not convert the response into an improper *ex parte* contact.

■ Finally, defendant argues that the trial court erred by ordering $1,800 restitution without better documentation of Mr. J.'s expenses. At the sentencing hearing Mr. J. swore that he had spent more than $3,000 on psychological counseling for R.J. This testimony alone is a sufficient basis for the trial court's award. (See *People v. Duff* (1987), 152 Ill. App. 3d 896, 898, 505 N.E.2d 36.) At the sentencing hearing on March 11, 1991, the trial court ordered the prosecutor to provide documentation of the payments, but 10 days later, without such documentation, the court ordered restitution. The court had the inherent power to correct or modify its prior interlocutory orders. (*People v. Mink* (1990), 141 Ill. 2d 163, 171, 565 N.E.2d 975.) Since the evidence presented at sentencing was sufficient to justify the restitution order, we find no error in the trial court's decision to order restitution despite the absence of the previously ordered documentation.

Although we find that defense counsel's conduct fell below an objective standard of reasonableness, we find a better result for de-

fendant was not reasonably probable even if counsel had not performed deficiently. The erroneously admitted hearsay probably had no prejudicial effect, since the most damaging hearsay was properly admissible. Most of the prosecutor's argument was legitimate comment on the evidence; the remarks which overstepped the bounds were not so severe as to deprive defendant of a fair trial. We find no error in other rulings to which defendant objects. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.